Lindsey H. Hughes, OSB # 833857
Trent J. Andreasen, OSB #195026
lhughes@keatingjones.com
tandreasen@keatingjones.com
Keating Jones Hughes, P.C.
200 SW Market Street, Suite 900
Portland, OR 97201-5737
Tel: 503-222-9955

Matthew S. Freedus, *DC Bar 475887
Rosie Dawn Griffin, *DC Bar 1035462
mfreedus@ftlf.com
rgiffin@ftlf.com
Feldesman Tucker Leifer Fidell LLP
1129 20th Street, NW, Suite 400
Washington, D.C. 20036
Tel: 202-466-8960

*Attorneys for Defendants Central City Concern and Letty Owings Center*

*Applications for admission *pro hac vice* pending

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**

| | |
|---|---|
| **NICOLE MORETTI, and WENDY NOVIS, as Personal Representative of the Estate of SAYLOR MORETTI, deceased** | **Case No.: 3:21-cv-01525-SI** |
| *Plaintiffs* | **MOTION TO SUBSTITUTE** |
| **v.** | |
| **LETTY OWINGS CENTER: CENTRAL CITY CONCERN, and/or the UNITED STATES acting through the DEPARTMENT OF HEALTH AND HUMAN SERVICES** | |
| *Defendants* | |

# TABLE OF CONTENTS

**Page**

**INTRODUCTION** .......... 1

**BACKGROUND** .......... 3

I. Health Center Immunity Under the Public Health Service Act and Federally Supported Health Centers Assistance Act .......... 3

**FACTUAL AND PROCEDURAL BACKGROUND** .......... 7

**ARGUMENT** .......... 11

I. Immunity is a Threshold Issue that Must be Determined Before the Court Considers or Decides FTCA Coverage .......... 12

II. The United States Should be Substituted as the Only Proper Defendant .......... 13

A. CCC and its Personnel, Including Letty Owings' Personnel, Were Deemed to be Federal Employees During the Period in Question and Acted within the Scope of Their Deemed Federal Employment .......... 13

B. Plaintiffs' Claims Arise from Letty Owings' Performance of Medical or Related Functions .......... 13

**CONCLUSION** .......... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agyin v. Razmzan*,
986 F.3d 168 (2d Cir. 2021) .......... 4, 5, 14

*Estate of Booker*,
10 F. Supp. 3d at 670 .......... 3, 5

*Bergeron v. Henderson*,
47 F. Supp. 2d 61 (D. Me. 1999) .......... 17

*Brignac v. United States*,
239 F. Supp. 3d 1367 (N.D. Ga. 2017) .......... 16

*Burroughs v. Abrahamson*,
964 F. Supp. 2d 1268 (D. Or. 2013), *aff'd sub nom. Burroughs v. United States*, 610 F. App'x 697 (9th Cir. 2015) .......... 14

*C. K. v. United States*,
No. 19-cv-2492, 2020 WL 6684921 (S.D. Cal. Nov. 12, 2020) .......... 5, 16

*Dan's City Used Cars, Inc. v. Pelkey*,
569 U.S. 251 (2013) .......... 15

*De La Cruz v. Graber*,
No. 16-cv-1294, 2017 WL 4277129 (C.D. Cal. June 15, 2017) .......... 17

*Hui v. Castaneda*,
559 U.S. 799 (2010) .......... *passim*

*Hunter v. Bryant*,
502 U. S. 224 (1991) (*per curiam*) .......... 6, 12

*K.R. v. Silverman*,
No. 08-cv-2192, 2009 WL 2959580 (E.D.N.Y. Aug. 13, 2009) .......... 15

*Kezer v. Penobscot Cmty. Health Ctr.*,
No. 15-cv-00225, 2019 BL 141566 (D. Me. Mar. 21, 2019) .......... 3, 16

*McMurray v. United States*,
918 F.2d 834 (9th Cir. 1990) .......... 14

*Mele v. Hill Health Ctr.*,
No. 06-cv-00455, 2008 WL 160226 (D. Conn. Jan. 8, 2008) .......... 16

*Mitchell v. Forsyth*,
472 U.S. 511 (1985)........................................................................................................5, 12

*Mixon v. CareSouth Carolina, Inc.*,
No. 22-cv-00269, 2022 WL 1810615 (D.S.C. June 2, 2022) ..................................................5

*Osborn v. Haley*,
549 U.S. 225 (2007)............................................................................................................12

*Pinzon v. Mendocino Coast Clinics Inc.*,
No. 14-cv-05504, 2015 WL 4967257 (N.D. Cal. Aug. 20, 2015) ..........................................16

*Pomeroy v. United States*,
No. 17-cv-10211, 2018 WL 1093501 (D. Mass. Feb. 27, 2018)............................................16

*Saucier v. Katz*,
533 U.S. 194 (2001)..............................................................................................................5

*Sierra v. Lincoln Family Medicine*,
No. 08-6165, 2008 WL 5068807 (D. Or. Nov. 24, 2008) ......................................................13

*Smith v. Harbison*,
19-cv-152, 2020 WL 6216758 (M.D. Ga. Oct. 22, 2020)..........................................................3

*Taboas v. Mlynczak*,
149 F.3d 576 (7th Cir. 1998).................................................................................................17

*Teresa T. v. Regaglia*,
154 F. Supp. 2d 290 (D. Conn. 2001)....................................................................................16

*Trap v. United States*,
No. 13-cv-00003, 2016 WL 6609212 (C.D. Cal. Mar. 7, 2016).............................................15

*Witt v. United States*,
319 F.2d 704 (9th Cir. 1963) ...........................................................................................14, 15

*Z.B. v. Ammonoosuc Cmty. Health Servs., Inc.*,
No. 03-cv-540, 2004 WL 1571988 (D. Me. June 13, 2004) ....................................................15

**Statutes**

28 U.S.C. § 1346(b) ..........................................................................................................14

42 U.S.C. § 254b................................................................................................................2, 7

42 U.S.C. § 233.............................................................................................................. *passim*

42 U.S.C. § 233(a) .......................................................................................................... *passim*

42 U.S.C. § 233(g) .......... *passim*

42 U.S.C. § 233(g)(1)(D) .......... 4

42 U.S.C. § 233(g)(1)(F) .......... 4

42 U.S.C. §§ 233(h) .......... 4, 8

42 U.S.C. § 254b .......... *passim*

42 U.S.C. § 254b(h) .......... 1, 2, 7

42 U.S.C. § 254b(h)(1) .......... 1

42 U.S.C. § 254b(k)(3)(G)(iii) .......... 8

42 U.S.C. § 290bb-1 .......... 19

Alcohol, Drug Abuse, and Mental Health Administration Reorganization Act of 1992, Pub. L. 102–321 (July 10, 1992), § 108 .......... 19

Bipartisan Budget Act of 2018, Pub. L. No. 115-123, § 50901(b), 132 Stat 64 (2018) .......... 7

Emergency Health Personnel Act of 1970, Pub. L. No. 91-623, § 4, 84 Stat. 1868, 1870–71 (1970) .......... 3, 6, 12

Federally Supported Health Centers Assistance Act, Pub. L. 102–501, 106 Stat 323 .......... 4, 5

Health Center Immunity Under the Public Health Service Act and Federally Supported Health Centers Assistance Act .......... 3

Pub. L. 104-73 .......... 4, 5

**Other Authorities**

42 C.F.R. § 6.6 .......... 2, 3, 15

42 C.F.R. § 51c.304(d)(v) .......... 18

116 Cong. Rec. 42,543 (1970) .......... 6

141 Cong. Rec. H14276 .......... 6

American Academy of Pediatrics, Policy Statement, *SIDS and Other Sleep-Related Infant Deaths: Evidence Base for 2016 Updated Recommendations for a Safe Infant Sleeping Environment*, https://tinyurl.com/4mb94nzh .......... 18, 20

Central City Concern, Letty Owings Center, https://centralcityconcern.org/recovery-location/letty-owings-center/ .....8

H.R. Rep. No. 1662, *reprinted in* 1970 U.S.C.C.A.N. 5775 (1970) .....6

Health Res. & Servs. Admin., U.S. Dep't of Health & Hum. Servs., Specialty Services and Health Centers' Scope of Project, PIN 2009-02, https://bphc.hrsa.gov/sites/default/files/bphc/compliance/pin-2009-02.pdf .....2

Katherine Drabiak, *Treating for two: reforming maternal substance abuse policy*, 32 Health Matrix 311, 344 .....21

Medicaid Innovation Accelerator Program (April 2017) https://www.medicaid.gov/state-resource-center/innovation-accelerator-program/iap-downloads/reducing-substance-use-disorders/asam-resource-guide.pdf .....18

Michael P. Botticelli & Howard K. Koh, *Changing the Language of Addiction*, 316 JAMA 13 (2016) .....7

Or. Admin. R. 309-018-0105(74) .....2, 18, 22

Or. Admin. R. 309-018-0105(84) .....21

Or. Admin. R. 309-018-0105(93) .....18, 21

SAMHSA, Mental Health and Substance Use Disorders, https://www.samhsa.gov/find-help/disorders .....20

SAMHSA, *Substance Abuse Treatment: Addressing the Specific Needs of Women: A Treatment Improvement Protocol* .....20

Substance Abuse and Mental Health Services Administration, Services Grant Program for Residential Treatment for Pregnant and Postpartum Women, https://www.samhsa.gov/grants/grant-announcements/ti-22-003 .....19

Velez, M. & Jansson, L.M., *The Opioid dependent mother and newborn dyad: Nonpharmacologic care* J. Addict. Med. 2008 September 1; 2(3): 113–120 https://pubmed.ncbi.nlm.nih.gov/19727440/ ..... 19, 20

**DEFENDANTS' CENTRAL CITY CONCERN AND LETTY OWINGS CENTER MOTION TO SUBSTITUTE THE UNITED STATES**

Defendants Central City Concern ("CCC"), a "federally-supported" health center, and Letty Owings Center ("Letty Owings")—a federally-approved CCC service delivery site and Oregon-licensed residential treatment facility—are entitled to absolute immunity from plaintiffs' claims under 42 U.S.C. § 233.[1] Accordingly, CCC hereby moves this Court to substitute the United States in its place as the only proper defendant in this action. In accordance with Local Rule 7-1 the parties have conferred in good faith to resolve the dispute; although plaintiffs' do not oppose this motion, the United States does oppose and, therefore, the dispute remains unresolved.

## INTRODUCTION

Congress has guaranteed absolute immunity to certain health care safety-net providers and their personnel for claims arising from their performance of medical or related functions undertaken within the scope of their employment. The Public Health Service (PHS) Act and the Federally Supported Health Centers Assistance Act (FSHCAA), as amended and codified at 42 U.S.C. § 233(a) and (g), provide that immunity by making the "remedy against the United States" under the Federal Tort Claims Act (FTCA) "exclusive of any other civil action or proceeding" against health centers the federal government has deemed to be PHS employees. 42 U.S.C. § 233(a).

CCC—which receives federal grant funding to support its provision of health care and related services to a "special medically-underserved population comprised of homeless individuals," 42 U.S.C. § 254b(h)(1)—is one such health center. CCC's activities are governed

[1] CCC and Letty Owings are a single legal entity.

by 42 U.S.C. § 254b(h), commonly known as the federal "Health Care for the Homeless" (or "HCH") program. *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Hum. Servs., Specialty Services and Health Centers' Scope of Project, PIN 2009-02, at 3 https://bphc.hrsa.gov/sites/default/files/bphc/compliance/pin-2009-02.pdf. As an HCH grantee, CCC is statutorily required to provide "substance abuse services," which, among other medical and related services, include "residential treatment." *Id.* at § 254b(h)(2), (h)(5)(B).

There is no dispute that CCC (through Letty Owings) operates a residential treatment facility within the scope of its HCH grant project—*i.e.*, its deemed federal employment—or that its residential treatment activities gave rise to this action. The only dispute for the Court to resolve is whether plaintiffs' complaint resulted from Letty Owings' and its personnel's "performance" of those "residential treatment" activities are "medical, surgical, dental . . . or related functions" within the meaning of 42 U.S.C. § 233(a). Residential treatment, as the term itself suggests, consists of "medical" and related services "to remediate symptoms" of a substance use disorder in a clinically managed facility under the "twenty-four hour observation and monitoring" of health care professionals. *See* Or. Admin. R. 309-018-0105(74), (93). Not only does the Health Center Program (42 U.S.C. § 254b *et seq.*) identify such "residential treatment" as a one of several "required health care services" of HCH grantees, but it is *that* statute (and the federal funding thereunder) that makes the HCH grantee eligible for federal status and immunity under § 233(a) and (g). It follows, logically and textually, that "residential treatment" under § 254b is a "medical . . . or related function[]" under § 233(a). 42 U.S.C. § 233(a), (g)(4). HHS acknowledged as much when it issued FSHCAA regulations interpreting the immunity granting statute's covered conduct as "acts and omissions related to the grant-supported activity of entities." 42 C.F.R. § 6.6(d). It stands to reason that an activity *mandated*

by the HCH grant is necessarily a "grant-supported activity." *Id.* The operative complaint alleges negligent acts or omissions in CCC and Letty Owings' performance of quintessential residential treatment functions and functions integrally related thereto. Although questions of duty, breach, and the standard of care questions are for the proper defendant to confront following the immunity determination, the obvious implication of such issues as being part and parcel of the merits of this case underscores the medical nature of the conduct giving rise to plaintiffs' claims.

If the Court, as it should, concludes that plaintiffs' claims arise from Letty Owings' performance of medical or related functions, the United States must be substituted as the only proper defendant. *See e.g.*, *Estate of Booker v. Greater Phila. Health Action*, Inc., 10 F. Supp. 3d 656, 670 (E.D. Penn. 2014); *see also Kezer v. Penobscot Cmty. Health Ctr.*, No. 1:15-cv-00225, 2019 BL 141566, at *6–7 (D. Me. Mar. 21, 2019), *Smith v. Harbison*, 4:19-cv-152, 2020 WL 6216758, at *5 (M.D. Ga. Oct. 22, 2020). The government's rationale as to why it refused to voluntarily substitute itself for CCC and Letty Owings rests on a tortured reading of the governing law and a mischaracterization of the facts.

## BACKGROUND

### I. Health Center Immunity Under the Public Health Service Act and Federally Supported Health Centers Assistance Act

Pursuant to the Emergency Health Personnel Act of 1970, Pub. L. No. 91-623, § 4, 84 Stat. 1868, 1870–71 (1970), *codified at* 42 U.S.C. § 233, PHS personnel are immune from any civil action or proceeding arising out of their performance of medical, dental, surgical, or related functions within the scope of their employment. 42 U.S.C. § 233(a); *see Hui v. Castaneda*, 559 U.S. 799, 806, 809 (2010). 42 U.S.C. § 233(a) affords the immunity at issue here. Congress provided in the Emergency Health Personnel Act of 1970, Pub. L. No. 91-623, that:

> The remedy against the United States provided by sections 1346(b) and 2672 of title 28 . . . for damage for personal injury, including death, resulting from the

> performance of medical, surgical, dental, or related functions . . . by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee . . . whose act or omission gave rise to the claim.

42 U.S.C. § 233(a). With the 1992 passage and 1995 amendment of the Federally Supported Health Centers Assistance Act ("FSHCAA"), Pub. L. 102–501 and Pub. L. 104-73, respectively, Congress unequivocally extended to health centers and their personnel "the same" immunity afforded to commissioned officers and employees of the PHS since the 1970s:

> The remedy against the United States for an entity described in paragraph (4) [a public or non-profit private entity receiving Federal funds under section 254b of this title] and any officer, governing board member, employee, or contractor . . . of such an entity who is deemed to be an employee of the Public Health Service pursuant to this paragraph *shall be exclusive* of any other civil action or proceeding *to the same extent as the remedy against the United States is exclusive pursuant to subsection [233](a)*.

§ 233(g)(1)(A), (4) (emphasis added); *see Agyin v. Razmzan*, 986 F.3d 168, 177 (2d Cir. 2021) (concluding deemed PHS physician "received from the federal government a delegation of the same legal immunity that is extended to employees of the Public Health Service").

The FSHCAA extends § 233(a)'s absolute immunity to certain federally-supported health centers and their personnel—including not only medical providers, but also officers, directors, and all employees (and certain contractors)—by authorizing HHS to "deem" them to be PHS employees for purposes of § 233(a). 42 U.S.C. § 233(g)(1)(D)–(F), (h). Such deeming is within the HHS Secretary's exclusive authority, and "[o]nce the Secretary makes a determination that an entity . . . is deemed to be an employee of the [PHS] for purposes of [§ 233], the determination [is] . . . final and binding upon the Secretary and the Attorney General and other parties to any civil action or proceeding." 42 U.S.C. § 233(g)(1)(F).[2] Both actual and deemed

[2] The United States perplexingly advised CCC that deeming determinations are made "in consultation with the Attorney General." Ex. 8 at 1. Congress repealed the consultation

PHS employees thus enjoy "absolute immunity . . . for actions arising out of the performance of medical or related functions within the scope of their employment." *Hui*, 559 U.S. at 806; *see also Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985) ("the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action."). As the Supreme Court unanimously recognized, the immunity is absolute (also known as "suit immunity") because it affords not only a defense from ultimate liability but also freedom from the burdens of litigation, regardless of the asserted theory of liability or ultimate merits of the underlying action. *See Hui*, 559 U.S. at 806 (holding that the broad language of § 233(a) "easily accommodates both known and unknown causes of action").

When assessing immunity in the context of claims against deemed health center defendants like CCC and Letty Owings, federal courts follow the "ordinary rules of evidence and procedure." *Hui*, 559 U.S. at 811. Where appropriate, substitution of the United States vindicates deemed health centers' statutory right to absolute immunity. *See Agyin*, 986 F.3d at 168; *Estate of Booker*, 10 F. Supp. 3d at 670 (ordering substitution in case removed to federal court); *Mixon v. CareSouth Carolina, Inc.*, No. 22-cv-00269, 2022 WL 1810615, at *4-8 (D.S.C. June 2, 2022) (same); *C. K. v. United States*, No. 19-cv-2492, 2020 WL 6684921, at *3, *7 (S.D. Cal. Nov. 12, 2020) (ordering substitution in case originating in federal court); *see also Saucier v. Katz*, 533 U.S. 194, 200-201 (2001) ("an immunity from suit rather than a mere defense to liability . . . like an absolute immunity . . . is effectively lost if a case is erroneously permitted to go to trial")

requirement in 1995, and concurrently made the Secretary's deeming determination final and binding on the Attorney General, imposed a mandatory duty on the Attorney General to appear in state court to report the *Secretary*'s deeming determination, afforded deemed PHS employees a right to a federal forum to challenge the government's failure or refusal to substitute the United States in their place, and imposed an automatic stay of proceedings pending such determinations. Pub. L. 102–501 to Pub. L. 104-73.

(*citing Mitchell*, 472 U. S. at 526); *Hunter v. Bryant*, 502 U. S. 224, 227 (1991) (*per curiam*) (hence, the Court has "repeatedly [] stressed the importance of resolving immunity questions at the earliest possible stage in litigation").

The absolute immunity CCC applied for and received—for all sites and personnel including Letty Owings and its staff—is set forth in a single statutory provision that broadly protects it from *any* action or proceeding resulting from the medical and related functions it performs in furtherance of its deemed federal employment, *i.e.*, its § 254b grant project. By encompassing any conceivable definition of medical negligence or malpractice, § 233(a) easily achieves at least one objective expressed in its legislative history—*i.e.*, to eliminate uncertainty as to whether § 233(a) fully replaces the need for costly private professional malpractice insurance. *See Hui*, 559 U.S. at 806. Section 233(a) immunity, as intended, facilitates the provision of medical services in underserved areas by broadly shielding both deemed and actual PHS personnel from the costs and burdens of civil actions arising out of their medical and related duties and, in turn, eliminating their need for costly professional malpractice insurance. *See* Pub. L. 91-623, § 2, 84 Stat. 1868 (1970); H.R. Rep. No. 1662, at 1, *reprinted in* 1970 U.S.C.C.A.N. 5775 (1970); 116 Cong. Rec. 42,543 (1970) (Rep. Staggers, House sponsor, observing PHS physicians "cannot afford to take out the customary liability insurance as most doctors do," "because of the low pay that so many of those who work in the [PHS] receive"); 141 Cong. Rec. H14276 (statement of Rep. Wyden) ("The bill allows [community health center]'s to reallocate desperately needed health care dollars from the coffers of private medical malpractice insurance companies to direct services for hundreds thousands more poor and rural Americans.").

**FACTUAL AND PROCEDURAL BACKGROUND**

Defendant Central City Concern ("CCC") is an Oregon non-profit, tax-exempt organization that receives federal funding under Section 330 of the PHS Act, *codified at* 42 U.S.C. § 254b, to provide medical care and related services to individuals experiencing homelessness in the Portland metropolitan area. CCC Service Area Competition Project Narrative, Ex. 1, at 1. During the relevant period, CCC operated three administrative sites, one mobile outreach unit, and fifteen permanent, fixed service delivery site locations. *Id*. Defendant Letty Owings is a federally-approved CCC service delivery site that has, since 1989, provided residential substance use disorder treatment and related health care and enabling services to women and their young children. *See* CCC Section 330 Grant Application, Form 5B, Ex. 2, at 5 (indicating Letty Owings operates as a 24/7 service delivery site added to CCC's HRSA scope of project in January 1989); *see also* Oregon State License, Ex. 3 (evidencing Letty Owings' status during the period in question as an Oregon state licensed alcohol and drug residential treatment facility); *see also* Ex. 1 at 15, 33–34 (indicating low-income women and single mothers in CCC's service area are especially susceptible to poverty, eviction, and the deleterious mental health impact of both). Due to its focus on a homeless patient population, CCC is required by statute to provide such residential treatment services. 42 U.S.C. § 254b(h)(2), (5)(B).[3] As a

[3] The terms "substance abuse services" and "substance use disorder services" in § 233(h)(2) and (h)(5)), respectively, are interchangeable. In 2018, Congress amended § 254b by striking the word "abuse" and replacing it with "use disorder" in subsections 254b(1)(A)(ii), (2)(A), and (h)(5), and used the "substance *use disorder*" phrase in a then-new iteration of subsection 254b(d). *See* Bipartisan Budget Act of 2018, Pub. L. No. 115-123, § 50901(b), 132 Stat 64 (2018). Leaving § 254b(h)(2) untouched was undoubtedly a scrivener's error, as the terminology shift is otherwise consistent and follows a deliberate effort to avoid stigmatizing labels, such as "abuse." *See*, *e.g.*, Michael P. Botticelli & Howard K. Koh, *Changing the Language of Addiction*, 316 JAMA 13, at 1361–62 (2016); Diagnostic and Statistical Manual of Mental Disorders (5th ed., 2013).

further condition of its receipt of grant funding, CCC must provide care regardless of any patient's ability to pay for its services. 42 U.S.C. § 254b(k)(3)(G)(iii).

At all times relevant to plaintiff's action, the Secretary of HHS, pursuant to 42 U.S.C. §§ 233(g) and (h), deemed CCC and its employees, including Letty Owings personnel, to be PHS employees for purposes of the immunity afforded by 42 U.S.C. § 233(a). *See* Ex. 4 (HHS notices of deeming action, calendar years 2019 and 2020, reflecting HHS's favorable deeming determinations); Ex. 5 at 9 (CCC deeming application, referencing Letty Owings as its "residential substance use disorder services program").

Letty Owings provides individual and family therapy services onsite and offers a trauma-informed approach to services. Recognizing that substance use disorder recovery is especially complex for individuals during pregnancy and while raising young children, Letty Owings offers a safe, inclusive environment for women to live with their children while undergoing treatment. *See* Central City Concern, Letty Owings Center, https://centralcityconcern.org/recovery-location/letty-owings-center/. Letty Owings provides "residential treatment, recovery and mental health counseling in individual and group settings, medication management to support recovery and mental health, development of birth plans and support after delivery, parent training and assistance with the transition to outpatient recovery treatment." Decl. of Amanda Risser, MD ("hereinafter "Risser Decl."), Ex. 6, ¶ 4. Treatment is in keeping with the development of Comprehensive Individual Service Plans appropriate to the needs of each patient. *Id.* ¶ 5. Services for mothers of infants include a significant focus on safe sleeping education and guidance. *See id.* ¶ 11 ("Safe sleeping education and guidance are considered important mitigation against sudden unexpected infant death").

Plaintiff Nicole Moretti was a CCC patient and Letty Owings resident during the relevant period, as was her son, Saylor Moretti, who was born during Ms. Moretti's residence at Letty Owings. Ms. Moretti was admitted to Letty Owings in early August 2019. Risser Decl. ¶ 12. Her admission record indicates she was experiencing homelessness at that time and sought residence and substance use disorder treatment at Letty Owings late in pregnancy out of a desire to maintain custody of her child post-partum and to be a responsible mother. Risser Decl., Attachment 1, Ex. 6A, at 1, 5, 11, 18.[4]

While a Letty Owings resident, Ms. Moretti, in addition to substance use disorder treatment, received general care coordination, medication review and management, and routine nursing care—provided by registered nurse ("RN") staff in coordination, as appropriate, with Letty Owings' Medical Director—for, at various times, medical issues including anxiety, pain, dental problems, edema, nausea and vomiting, and smoking cessation assistance. Risser Decl. Attachment 1 at 2–4, 5–6.

Ms. Moretti gave birth to Saylor via emergency C-section on September 7, 2019. Am. Compl. ¶ 1; Risser Decl. Attachment 1 at 2, 12–22. Following Saylor's birth, Ms. Moretti and Saylor returned to Letty Owings to continue her residential treatment. Just as she had while pregnant, Ms. Moretti continued, after Saylor's birth, to receive medical care from Letty Owings staff in coordination with her primary care provider and other providers. Risser Decl. Attachment 1 at 19–20, 21–22. As a new mother, she received additional care from Letty Owings staff related to her post-partum condition and to Saylor's interdependent health and wellbeing, including counseling and behavior management related to safe sleeping, a crucial mitigation

[4] Plaintiffs, via counsel, have authorized the filing of these records and those included in Risser Decl., Attachment 2, Ex. 6B, which constitute relevant excerpts of Nicole Moretti's and Saylor Moretti's medical records, respectively.

against sudden unexpected infant death ("SUID") risk and a core component of maternal-infant care. Risser Decl. ¶¶ 11, 13–14; *see also* Risser Decl. Attachment 1 at 2.

Following his birth, Saylor, like Ms. Moretti, received medical and related services from Letty Owings' medical personnel including general case management and monitoring, as well as evaluation, treatment, and care coordination related to complaints such as fever and congestion. *See generally* Risser Decl., Attachment 2, Ex. 6B. (indicating care received from Letty Owings RN staff in consultation with Medical Director).

Saylor Moretti died on October 4, 2019. Plaintiffs allege he died "when Nicole Moretti's weight came to rest or press against Saylor in such a way as to prevent his adequate breathing" while the two shared a bed. Am. Compl. ¶ 12. On October 9, 2019, in response to Saylor's death, the Oregon Department of Health visited and evaluated Letty Owings, with particular attention to its policies and practices related to resident co-sleeping. Ex. 7 at 2. The site visit resulted in no identified areas of noncompliance. *Id.* at p. 4.

On May 3, 2022—following the plaintiffs' filing of both this suit and an administrative tort claim—Assistant United States Attorney Michael Jeter notified CCC, purportedly on behalf of HHS, that "[t]he [HHS] Secretary has determined that it shall not extend coverage to defendants Central City Concern and Letty Owings Center ("Defendants"), with respect to the actions and omissions that are the subject of this civil action because the allegations comprising Plaintiffs' claims do not arise out of medical malpractice." Letter from Michael Jeter, Assistant U.S. Att'y to Central City Concern (May 3, 2022), Ex. 8 (Letter from Jennifer B. Smith, Acting Deputy Associate General Counsel, Office of the General Counsel, U.S. Dep't of Health & Hum. Servs., to Rachel Solotaroff, Chief Executive Officer, Central City Concern), Ex. 9 at 1 (noting Wendy Novins' filing of Administrative Tort Claim No. 2021-0365 as personal representative

for the estate of Saylor Moretti). DOJ's reasoning that the claims fall outside the scope of § 233(a) immunity hinges on its erroneous legal conclusion that "Plaintiffs' claims arise out of injuries resulting from an alleged breach of a general duty imposed on premises owners to individuals like Plaintiffs, not medical malpractice." Ex. 8. The instant motion follows to vindicate CCC's—and, by extension, Letty Owings' and its personnel's—absolute immunity.

## ARGUMENT

Central City Concern is entitled to absolute immunity from plaintiffs' claims. The United States erred in refusing to voluntarily substitute itself as the sole defendant in place of CCC and Letty Owings. The Court should correct that error by addressing immunity as a threshold issue (*i.e.*, before considering the portions of the United States' Motion to Dismiss, ECF No. 26, that pertain to the merits of plaintiffs' claims under the FTCA), concluding that CCC meets all statutory criteria for immunity, and ordering the substitution of the United States as the sole proper defendant.

Each requirement for absolute immunity is met here. There is no dispute that HHS prospectively deemed CCC and its employees—including Letty Owings and its personnel—to be PHS employees during the period relevant to plaintiffs' claims. It is likewise undisputed that CCC, through its employees, was working within the scope of its deemed federal employment—within the meaning of the FTCA and, by extension, Oregon law—when providing residential treatment services to Ms. Moretti. And it is easily ascertained from the record that plaintiffs' claims, as alleged, *result from* CCC's—including Letty Owings'—covered conduct as § 233 requires.

## I. Immunity is a Threshold Issue that Must be Determined Before the Court Considers or Decides FTCA Coverage

CCC's, and by extension Letty Owings', right to absolute immunity is a threshold issue the Court should determine before ruling on the United States' motion to dismiss or otherwise considering the merits of plaintiffs' claims. It is well established that any assertion of absolute immunity should be resolved as a threshold issue—ideally, at the earliest stages in litigation—before a court considers or decides the merits of the underlying claim. *See, e.g., Osborn v. Haley*, 549 U.S. 225, 253 (2007) (considering immunity in context of Westfall Act and noting "[i]mmunity-related issues, the Court has several times instructed, should be decided at the earliest opportunity."); *see also Hunter*, 512 U.S. at 227 ("[W]e repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.") (collecting cases). This is so because "the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action." *Mitchell*, 472 U.S. at 525 (citing *Nixon v. Fitzgerald*, 457 U.S. 731 (1982)).

Here, the Court must necessarily determine immunity—under the ordinary rules of evidence and procedure—as a first step before reaching the United States' motion to dismiss. *Hui*, 559 U.S. at 811. The Court's decision on immunity will determine the proper defendant and will thus dictate which of two very distinct paths this case may take. If the Court grants the relief sought in this motion, the United States' substantive arguments against FTCA coverage—expressed in Section II of the United States' Motion—can be considered. If instead the Court, as the United States urges, finds that plaintiffs' claims fall outside § 233(a) immunity (and assuming no interlocutory appeal or an unsuccessful one), the arguments are moot and the case has no place in federal court.

## II. The United States Should be Substituted as the Only Proper Defendant

The Court should substitute the United States as the only proper defendant because CCC, including the Letty Owings Center and its personnel, were, at all times relevant to plaintiffs' claims: (1) deemed to be PHS employees; (2) working within the scope of their deemed federal employment; (3) and performing medical and related functions which gave rise to plaintiffs' claims. As CCC and Letty Owings were deemed to be PHS employees at all relevant times, and there is no genuine dispute as to whether the alleged acts or omissions occurred within the scope of CCC's and Letty Owings' deemed employment, immunity hinges on whether plaintiffs' action results from CCC's and Letty Owings' "performance of medical . . . or related functions" within the meaning of § 233(a). 42 U.S.C. § 233(a), (g); *see Hui*, 559 U.S. at 806; *Sierra v. Lincoln Family Medicine*, No. 08–6165–AA, 2008 WL 5068807, at *3 (D. Or. Nov. 24, 2008) ("If an entity has been deemed a Public Health Service employee, then a plaintiff's exclusive remedy . . . is against the United States under the FTCA.").

### A. CCC and its Personnel, Including Letty Owings' Personnel, Were Deemed to be Federal Employees During the Period in Question and Acted within the Scope of Their Deemed Federal Employment

There is no dispute that CCC and its personnel—and by extension Letty Owings and its personnel—were deemed to be federal employees: official HHS notices confirm CCC's deemed status. Ex. 4. As stated in each notice, a deemed period operates like an occurrence-based insurance policy because its coverage is based on when the conduct or events giving rise to the claim occurred, regardless of when the claim is actually made. *Id.* at 3. ("FTCA coverage is comparable to an 'occurrence' policy without a monetary cap.").

Likewise, neither plaintiffs nor the United States assert that plaintiffs' claims arise from Letty Owings or its personnel acting outside the scope of their deemed federal employment.

Here, scope of employment is determined under Oregon law. *See* 28 U.S.C. § 1346(b) (scope of employment is to be assessed "in accordance with the law of the place where the act or omission occurred"); *McMurray v. United States*, 918 F.2d 834, 836 (9th Cir. 1990) ("Under the Federal Tort Claims Act, suits against the United States are governed by the substantive law of the place where the act or omission complained of occurs."); *Agyin*, 986 F.3d at 186 ("The FTCA is unambiguous that [the deemed health center physician]'s scope of employment is to be determined by [state] law"). Where a deemed entity, rather than an individual, asserts immunity, scope of employment entails an analysis of the entity's federal grant project.

In Oregon, an employee's conduct "is within the course and scope of her employment if: (1) the conduct . . . occurred substantially within the time and space limits authorized by the employment; (2) the employee [was] motivated, at least partially, by a purpose to serve the employer; and (3) the act [was] of a kind that the employee was hired to perform." *Burroughs v. Abrahamson*, 964 F. Supp. 2d 1268, 1270 (D. Or. 2013), *aff'd sub nom. Burroughs v. United States*, 610 F. App'x 697 (9th Cir. 2015) (citing *Chesterman v. Barmon*, 305 Or. 439, 442, 753 P.2d 404 (1988)). Conversely, it is well-settled under Oregon law that "an employer is shielded from liability when an employee commits an act to serve his own interest or to gratify his own desires." *Witt v. United States*, 319 F.2d 704, 709 (9th Cir. 1963) (citing *French v. Cresswell*, 13 Or. 418, 11 P. 62 (1886)).

Plaintiffs' complaint alleges Saylor Moretti died—while a resident and patient of Letty Owings—because of Letty Owings' acts and omissions related to maternal-child health policies, hiring, training, and staffing decisions, and the supervision and monitoring functions of residential treatment. Am. Compl. ¶ 14. The activities are comfortably within CCC's grant project, which has, since 1989, included the provision of residential substance use disorder

treatment and recovery services to young mothers and their children, aged infant to six years, at its Letty Owings Center. Ex. 2; Ex. 8. Plaintiffs' complaint likewise provides no indication that the alleged injuries stemmed from any Letting Owings employee acting outside the scope of his or her deemed federal employment. Indeed, the complaint names no individual employees at all, strongly indicating that plaintiffs' alleged injuries could not have resulted from "an employee commit[ting] an act to serve his own interest or gratify his own desires." *Witt*, 319 F.2d at 709.

### B. Plaintiffs' Claims Arise from Letty Owings' Performance of Medical or Related Functions

Plaintiffs' claims arise from Letty Owings' performance of medical or related functions within the meaning of § 233(a). The immunity-granting provision's covered conduct is stated in broad terms—that is, "medical, surgical, dental, and related functions." § 233(a). Not only is each specified function—e.g., all "medical" functions—a broad concept, the short phrases "related functions" in the statute and "related to" in the associated regulation, 42 C.F.R. § 6.6, further expand the enumerated, covered functions to include ancillary services. *See Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (ordinary usage of words "related to" means to broaden and expresses a broad purpose); *Z.B. v. Ammonoosuc Cmty. Health Servs., Inc.*, No. Civ. No. 03-cv-540, 2004 WL 1571988, *4 (D. Me. June 13, 2004) (phrase "related to" in agency's FSHCAA regulation, 42 C.F.R. § 6.6(d), recognizes that § 233(a) immunity extends beyond the mere act of providing medical care); *see also Trap v. United States*, No. CV-13-00003, 2016 WL 6609212, at *3–4 (C.D. Cal. Mar. 7, 2016) (recognizing § 233(a) immunity for a PHS employee who allegedly instructed guards to withhold food and water whenever the prisoner left the prison to receive medical treatment); *K.R. v. Silverman*, No. 08-cv-2192, 2009 WL 2959580, at *7 (E.D.N.Y. Aug. 13, 2009).

Against this backdrop, courts have broadly interpreted the sorts of activities that fall within the scope of medically "related functions." *See, e.g., Kezer*, 2019 BL 141566, at *8 (D. Me. Mar. 21, 2019) (concluding deemed defendants' accessing plaintiff's confidential medical record constituted a related function as "the performance of quality improvement and quality assurance activities . . . are patently related to the provision of medical services."); *Brignac v. United States*, 239 F. Supp. 3d 1367, 1377 (N.D. Ga. 2017) (concluding "hiring and retention of . . . physicians is directly connected to [the] provision of medical care"); *Teresa T. v. Regaglia*, 154 F. Supp. 2d 290, 300 (D. Conn. 2001) (concluding physician's decision whether to report suspected child abuse is a "related function to the doctor's performance of medical services") (internal quotation marks omitted); *C. K.*, 2020 WL 6684921, at *6) (concluding claim based on chief medical officer's alleged concealment of and failure to report subordinate physician's sexual misconduct resulted from performance of "medical . . . or related functions"); *see also Mele v. Hill Health Ctr.*, No. 3:06-cv-00455, 2008 WL 160226, at *3 (D. Conn. Jan. 8, 2008) (concluding claim resulting from improper disclosure of medical information "concern[ed] the medical functions of providing treatment and the related function of ensuring the privacy of patient medical information," and was "covered by section 233(a)" immunity); *Pomeroy v. United States*, No. 17-cv-10211, 2018 WL 1093501, at *3–4 (D. Mass. Feb. 27, 2018) (rejecting government position that claim was for "negligent provision of food" and concluding deemed residential treatment facility's execution of a resident's treatment plan qualified as "related function" under § 233(a) when nurse, contrary to care plan, provided solid food to patient with known swallowing disability); *Pinzon v. Mendocino Coast Clinics Inc.*, No. 14-cv-05504, 2015 WL 4967257, at *3 (N.D. Cal. Aug. 20, 2015) (concluding § 233(a) extends beyond medical negligence claims to cover alleged violations of the Americans with Disabilities Act, HIPAA,

and Civil Rights Act of 1964); *De La Cruz v. Graber*, No. 16-cv-1294, 2017 WL 4277129 at *3–4 (C.D. Cal. June 15, 2017), *report and recommendation adopted*, 2017 WL 4271122 (C.D. Cal. Sept. 21, 2017) (concluding medical administrator, whose performance of administrative duties gave rise to constitutional tort claim, was immune under § 233(a)).

As an initial matter, plaintiffs' complaint facially alleges professional negligence or malpractice, as all alleged acts and omissions[5] are couched in terms of an "in-patient treatment" facility's "residential care" responsibility to a mother and her newborn child, *both* as residents of the facility. Am. Compl. ¶ 13, 14. In particular, plaintiffs allege Letty Owings had a duty to provide "residential care" appropriate to the "needs" of both Nicole and Saylor Moretti, including the "management" and "supervision" of their sleeping environment "to avoid the known risk of co-sleeping—where a parent and child fall asleep in the same bed." *Id.* ¶ 13. Letty Owings allegedly violated the standard of care by allowing Nicole and Saylor Moretti to sleep in the same bed, despite the American Academy of Pediatrics ("AAP") statement that bed-sharing is "one of the most dangerous practices leading to death of infants in the U.S." *Id.* ¶ 11. Letty Owings, per plaintiffs' allegations, lacked appropriate policies to avoid co-sleeping, failed to provide adequate staff to prevent co-sleeping, failed to provide a safe sleep surface, failed to adequately train and supervise staff, and failed to monitor and avoid plaintiffs' co-sleeping arrangement. *Id.* ¶ 14. Several functions plaintiffs allege Letty Owings failed to perform track AAP safe sleep recommendations. *See* American Academy of Pediatrics, Policy Statement, *SIDS*

[5] A complaint's characterization of a defendant's conduct is not controlling for purposes of the threshold immunity determination. If the alleged conduct, accepted as true, constitutes the performance of medical or related functions within a deemed defendant's scope of employment, the immunity inquiry typically ends. If there is a genuine dispute of material fact, limited discovery and/or an evidentiary hearing may be appropriate. *See Taboas v. Mlynczak*, 149 F.3d 576, 580–82 (7th Cir. 1998); *Bergeron v. Henderson*, 47 F. Supp. 2d 61, 68 (D. Me. 1999).

*and Other Sleep-Related Infant Deaths: Evidence Base for 2016 Updated Recommendations for a Safe Infant Sleeping Environment*, https://tinyurl.com/4mb94nzh (recommending, *inter alia*, separate sleep surface designed for infants, staff training on safe sleep policies and practices).

Apart from plaintiffs' characterizations, there should be no question that "residential treatment" for substance use disorders is medical in nature, involving medical and related functions. 42 U.S.C. § 233(a). The statute under which CCC is eligible for deemed PHS status—42 U.S.C. § 254b—defines "residential treatment" for substance use disorders as a "primary health services" all HCH grantees must perform as a condition of their grant. *Id*. at § 254b(h)(2), (h)(5)(B). CCC, as a federal grantee, must operate Letty Owings "in compliance with applicable Federal, State, and local laws and regulations." 42 C.F.R. § 51c.304(d)(v). Under Oregon law, the Oregon Health Authority licenses residential treatment facilities to provide "assessment, treatment, rehabilitation, and twenty-four hour observation and monitoring for individuals with substance use dependence, consistent with Level III of [American Society of Addiction Medicine Patient Placement Criteria]." *See* Or. Admin. R. 309-018-0105(74); Medicaid Innovation Accelerator Program, (April 2017) https://www.medicaid.gov/state-resource-center/innovation-accelerator-program/iap-downloads/reducing-substance-use-disorders/asam-resource-guide.pdf (defining Level III as having "four sublevels that represent a range of intensities of service. The uniting feature is that these services all are provided in a structured, residential setting that is staffed 24 hours daily and are *clinically managed*") (emphasis in original).

In keeping with Oregon Health requirements, Letty Owings provides, among other care and services, "the planned, *medically appropriate*, individualized program of medical, psychological, and rehabilitative procedures, experiences and activities designed to *remediate symptoms of a DSM diagnosis* that are included in the Service Plan." Or. Admin. R. 309-018-

0105(93) (emphasis added). To perform its residential treatment function, Letty Owings uses an interdisciplinary team of health care professionals, including an onsite medical director physician, registered nurses, addictions counselors, licensed professional counselors, and allied health professionals who provide treatment assistance and residential oversight. Risser Decl. ¶ 5.

Letty Owings—designed and intended to serve pregnant women and mothers of young children—employs a dyadic model of care through which interdependent maternal and child health is concurrently addressed. *See, e.g.,* Risser Decl. Attachment 1, at 19–20 (indicating RN counseling and care coordination related to breastfeeding and discussion of "benefits of [smoking] cessation for client and newborn); Risser Decl. Attachment 2, at 2 (evidencing nurse's encouragement of "skin to skin [contact between Nicole and Saylor] to promote attachment/protect against w/d," discussion of "'eat, sleep, console'" as protective against [neonatal abstinence syndrome]," and counseling related to breastfeeding, supplementing Saylor's nutritional needs with formula, and diaper rash avoidance), 24–25 (evidencing WIC counseling and enabling assistance); *see also e.g.*, Velez, M. & Jansson, L.M., *The Opioid dependent mother and newborn dyad: Nonpharmacologic care*, J Addict Med. 2008 September 1; 2(3): 113–120, doi:10.1097/ADM.0b013e31817e6105, https://pubmed.ncbi.nlm.nih.gov/19727440/.[6] The Letty Owings team of health professionals and

---

[6] HHS has long supported dyadic care in residential treatment programs. *See*, *e.g.*, Alcohol, Drug Abuse, and Mental Health Administration Reorganization Act of 1992, Pub. L. 102–321 (July 10, 1992), § 108, Programs for Pregnant and Postpartum Women, 106 Stat 323, *codified at* 42 U.S.C. § 290bb-1 (authorizing HHS grant funds for "public and nonprofit private entities for the purpose of providing to pregnant and postpartum women treatment for substance abuse through programs in which … the women reside in facilities provided by the programs … [and] the minor children of the women reside with the women in such facilities, if the women so request"); Substance Abuse and Mental Health Services Administration, Services Grant Program for Residential Treatment for Pregnant and Postpartum Women, https://www.samhsa.gov/grants/grant-announcements/ti-22-003.

others houses and treats the mother-infant dyad in the same room and meets children's health needs through providers' coordination with, and treatment of, children's mothers. *See* Risser Decl. ¶¶ 5, 9, 11, 13; *see also* SAMHSA, *Substance Abuse Treatment: Addressing the Specific Needs of Women: A Treatment Improvement Protocol*, SAMHSA (2013) (noting "[w]omen in recovery see the support of their children as an essential ingredient for their recovery" and suggesting "[T]reatment services for women must . . . address specific needs for women, pregnant women, and women with children such as medical services, health promotion, life skills, family- and child-related treatment services, comprehensive and coordinated case.") (citing Tracy, E.M., and Martin, T.C. *Children's Roles In The Social Networks Of Women In Substance Abuse Treatment*, Journal of Substance Abuse Treatment 32(1):81–88, (2007)); Velez, M. & Jansson, L.M., *The Opioid Dependent Mother And Newborn Dyad: Nonpharmacologic Care*, J Addict Med. 2008 September 1; 2(3): 113–120, doi:10.1097/ADM.0b013e31817e6105, https://pubmed.ncbi.nlm.nih.gov/19727440/ ("An essential component of non-pharmacologic care is the education and facilitation of maternal involvement with the infant.").

This model of care is hardly without risk. A recovering mother's medical condition inherently involves circumstances which, according to the AAP, "substantially increase the risk of SIDS or unintentional injury or death while bed-sharing." Substance use disorder is a chronic disease that causes clinically significantly impairment to an individual's health and ability to meet major responsibilities at work, school, or home (e.g., parenting). *See* SAMHSA, Mental Health and Substance Use Disorders, https://www.samhsa.gov/find-help/disorders. A mother in recovery may be experiencing depression, maternal fatigue, and adverse effects of medication, among other challenges. *See* American Academy of Pediatrics, Policy Statement, *SIDS and Other Sleep-Related Infant Deaths: Evidence Base for 2016 Updated Recommendations for a*

*Safe Infant Sleeping Environment*, https://tinyurl.com/4mb94nzh ("[b]ed-sharing with someone who is impaired in his or her alertness or ability to arouse because of fatigue or use of sedating medications (e.g., certain antidepressants, pain medications) or substances (e.g., alcohol, illicit drugs)" substantially increases the risk of sleep related infant deaths). "Even when taken as prescribed, opioid agonist medications can result in maternal somnolence, or extreme sedation and tiredness." Katherine Drabiak, *Treating for two: reforming maternal substance abuse policy*, 32 Health Matrix 311, 344, Health Matrix: Journal of Law-Medicine (2022). Such "somnolence also impacts the mother's ability to breastfeed and whether she can: position the infant safely; respond to infant cues of tiredness, hunger and comfort; make effective judgments; and accurately assess risks." *Id.*

Residential treatment facilities like Letty Owings anticipate and mitigate such risks with a "medically appropriate" and "individualized" service plan, which may include counseling, medication management, and 24-hour observation and monitoring including through periodic room checks, as appropriate. *See* Or. Admin. R. 309-018-0105(93); *see also* Or. Admin. R. 309-018-0105(84) (mandating that residential "[t]reatment programming and planning must be specialized to the population and individual being served"); *see also* Risser Decl. Attachment 3, Ex. 6C, at 1 ("Open Red Chart Checklist" indicating provision of safety planning and other services specific to children), 7, 165, 69–71 ("For your child's safety staff will do room checks every night. . . . Our staff is here to assist you in learning about safe sleep"), 205–209 (safe sleep materials).

The alleged acts and omissions which resulted in this action are "medical . . . or [at the very least] related functions." 42 U.S.C. § 233(a). They not only involve the discretion and judgment of health care professionals trained and experienced in residential treatment and the

needs of the homeless population they serve, but also appear in Oregon's definition of a licensed residential treatment program for substance use disorders. *See* Or. Admin. R. 309-018-0105(74) (residential treatment facility "provides assessment, treatment, rehabilitation, and twenty-four hour observation and monitoring for individuals with substance use dependence"), 309-018-0105(93) ("treatment" consists of "the planned, medically appropriate, individualized program of medical, psychological, and rehabilitative procedures, experiences and activities designed to remediate symptoms of a DSM diagnosis that are included in the Service Plan"). Moreover, these functions all share and directly serve a common objective—the inherently interrelated health and well-being of the mother-child dyad.

## CONCLUSION

For the foregoing reasons the Court should grant this motion and substitute the United States as the sole defendant in place of CCC and Letty Owings.

Dated: July 25, 2022

Submitted by:

/s/ *Lindsey H. Hughes*
Lindsey H. Hughes
lhughes@keatingjones.com
Keating Jones Hughes, P.C.
200 SW Market Street, Suite 900
Portland, OR 97201-5737
(t) 503-222-9955
(f) 503-796-0699

Matthew S. Freedus, DC Bar # 475887
mfreedus@ftlf.com
Rosie Dawn Griffin, DC Bar # 1035462
rgriffin@ftlf.com
1129 20th Street, NW, Suite 400
Washington, DC 20036
(t) 202-466-8960
(f) 202-293-8103

*Attorneys for Defendants Central City Concern and Letty Owings Center*