Lindsey H. Hughes, OSB # 833857
Trent J. Andreasen, OSB #195026
lhughes@keatingjones.com
tandreasen@keatingjones.com
Keating Jones Hughes, P.C.
200 SW Market Street
Suite 900
Portland, OR 97201-5737
Tel: 503-222-9955

Matthew S. Freedus, *DC Bar 475887
Rosie Dawn Griffin, *DC Bar 1035462
mfreedus@ftlf.com
rgiffin@ftlf.com
Feldesman Tucker Leifer Fidell LLP
1129 20th Street, NW, Suite 400
Washington, D.C. 20036
Tel: 202-466-8960

*Attorneys for Defendants Central City Concern and Letty Owings Center*

*Applications for admission *pro hac vice* pending

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**

**NICOLE MORETTI, and WENDY NOVIS, as Personal Representative of the Estate of SAYLOR MORETTI, deceased**

*Plaintiffs*

**v.**

**LETTY OWINGS CENTER, CENTRAL CITY CONCERN, and/or the UNITED STATES acting through the DEPARTMENT OF HEALTH AND HUMAN SERVICES**

*Defendants*

**Case No.: 3:21-cv-01525-SI**

**OPPOSITION TO UNITED STATES' MOTION TO DISMISS**

# TABLE OF CONTENTS


**Page**

**INTRODUCTION** ... 1

**LEGAL AND REGULATORY BACKGROUND** ... 2

**FACTUAL AND PROCEDURAL HISTORY** ... 6

**ARGUMENT** ... 9

I. The United States is the Sole Proper Defendant Because CCC and Letty Owings Are Immune from Plaintiffs' Claims ... 10

II. The United States' Arguments Against Immunity and Substitution are Without Merit ... 12

A. Immunity is not Limited to Claims of Health Center Patients ... 13

B. Immunity Covers "Any" Action Or Proceeding Resulting From Covered Conduct, And Is Not Limited To Medical Malpractice ... 18

**CONCLUSION** ... 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agyin v. Razmzan*,
986 F.3d 168 (2d Cir. 2021)....4, 14

*Estate of Booker v. Greater Phila. Health Action*,
10 F. Supp. 3d 656 (E.D. Pa. 2014)....3, 4

*C. K. v. United States*,
No. 19-cv-2492, 2020 WL 6684921 (S.D. Cal. Nov. 12, 2020)....5

*Dan's City Used Cars, Inc. v. Pelkey*,
569 U.S. 251 (2013)....12

*De La Cruz v. Graber*,
No. 16-cv-1294, 2017 WL 4277129 (C.D. Cal. June 15, 2017)....19

*Downing-Powers v. Sec'y of Health & Hum. Servs.*,
No. 15-1043V, 2020 WL 4197303 (Fed. Cl. June 2, 2020)....21

*Bohn ex rel. G.B. v. Sec'y of Health & Hum. Servs.*,
No. 16-0265V, 2021 WL 4302367 (Fed. Cl. Aug. 23, 2021)....21

*Garcia v. Ives*,
No. 3:18-CV-0176-HZ, 2020 WL 6323934 (D. Or. Oct. 25, 2020)....4

*Hui v. Castaneda*,
559 U.S. 799 (2010).... *passim*

*Hunter v. Bryant*,
502 U. S. 224 (1991)....5

*K.R. v. Silverman*,
No. 08-cv-2192, 2009 WL 2959580 (E.D.N.Y. 2009)....12

*Mitchell v. Forsyth*,
472 U. S. 511 (1985)....11, 13

*Mixon v. CareSouth Carolina, Inc.*,
No. 22-cv-00269, 2022 WL 1810615 (D.S.C. June 2, 2022)....4

*Pinzon v. Mendocino Coast Clinics Inc.*,
No. 14-cv-05504, 2015 WL 4967257 (N.D. Cal. Aug. 20, 2015)....19

*Pomeroy v. United States*,
No. 17-cv-10211, 2018 WL 1093501 (D. Mass. Feb. 27, 2018) ........................................19

*Saucier v. Katz*,
533 U.S. 194 (2001) ........................................5

*Trap v. United States*,
No. 13-cv-00003, 2016 WL 6609212 (C.D. Cal. Mar. 7, 2016) ........................................12

*United States v. Woods*,
571 U.S. 31 (2013) ........................................23

*Z.B. v. Ammonoosuc Cmty. Health Servs., Inc.*,
No. 03-cv-540, 2004 WL 1571988 (D. Me. June 13, 2004) ........................................12

**Statutes**

42 U.S.C. § 233 ........................................ *passim*

42 U.S.C. § 233(a) ........................................6, 9, 10, 13

42 U.S.C. § 254b ........................................6, 20

42 U.S.C. § 233(g) ........................................ *passim*

42 U.S.C. § 233(h) ........................................7

42 U.S.C. § 254b(a)(1) ........................................3

42 U.S.C. § 254b(h)(2) ........................................6

42 U.S.C. § 254b(h)(5)(B) ........................................6

42 U.S.C. § 254b(k)(3)(G)(iii) ........................................7

42 U.S.C. § 290bb-1 ........................................16

Alcohol, Drug Abuse, and Mental Health Administration Reorganization Act of 1992, Pub. L. 102-321 (July 10, 1992) ........................................16

Bipartisan Budget Act of 2018, Pub. L. No. 115-123, 132 Stat 64 (2018) ........................................6

Federally Supported Health Centers Assistance Act of 1995, Pub. L. 104-73, 109 Stat. 777 (1995) ........................................3, 4

Pub. L. 91-623, § 2, 84 Stat. 1868 (1970) ........................................1, 5

Pub. L. 102–501, 106 Stat. 3268 (1992) ........................................3

**Other Authorities**

42 C.F.R. § 6.6 ....................12, 14

42 C.F.R. § 51c.304(d)(v) ....................20

141 Cong. Rec. H14276 ....................5

Disease Control and Prevention, *Vital Signs*, *Safe Sleep for Babies: Eliminating Hazards*, https://www.cdc.gov/vitalsigns/safesleep/index.html ....................22

H.R. Rep. 102-823, pt. 1 (1992) ....................5

H.R. Rep. No. 91-1662 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5775; 116 Cong. Rec. 42,543 ....................5

H.R. Rep. No. 102–823 (1992), pt. 1, *reprinted in* 1992 U.S.C.C.A.N. 2627 ....................3

H.R. Rep. No. 104–398 (1995), *reprinted in* 1995 U.S.C.C.A.N. 767 ....................4

Health and Human Services, Office of Inspector General, *Cost to the Government for Providing Medical Malpractice Coverage to Community and Migrant Health Centers* 3 (Mar. 25, 1996) ....................3

Kate Margolis, et. al., *Babies Don't Go to the Doctor by Themselves: Innovating a Dyadic Behavioral Health Model to Serve the Youngest Primary Care Patients and Their Families*, https://cachildrenstrust.org/wp-content/uploads/2020/05/Dyadic_final_May2020.pdf ....................17

Local Rule 7-1(b) ....................1

Medicaid Innovation Accelerator Program (April 2017) https://www.medicaid.gov/state-resource-center/innovation-accelerator-program/iap-downloads/reducing-substance-use-disorders/asam-resource-guide.pdf ....................20

Michael P. Botticelli & Howard K. Koh, *Changing the Language of Addiction*, 316 JAMA 13 (2016) ....................6

National Center for Children in Poverty, *Dyadic Treatment*, https://www.nccp.org/dyadic-treatment ....................16

National Institute for Health and Care Excellence (NICE), *Postnatal Care: Co-sleeping Risk Factors*, NICE Guideline No. 194 (Apr. 2021), https://www.ncbi.nlm.nih.gov/books/NBK571558/ ....................21

Or. Admin. R. 309-018-0105(74) ....................20

Or. Admin. R. 309-018-0105(93) ....................21

Oregon Health Authority, *Safe Sleep for Babies*, *About SUID and SIDS*, https://www.oregon.gov/oha/ph/healthypeoplefamilies/babies/pages/sids.aspx .....................22

SAMHSA, *Substance Abuse Treatment: Addressing the Specific Needs of Women: A Treatment Improvement Protocol* ..........................................................................15

SAMHSA, Substance Abuse and Mental Health Services Administration, Services Grant Program for Residential Treatment for Pregnant and Postpartum Women, https://www.samhsa.gov/grants/grant-announcements/ti-22-003; ..........................................................................................................16

Velez, M. & Jansson, L.M., *The Opioid dependent mother and newborn dyad: Nonpharmacologic care* J. Addict. Med. 2008 September 1; 2(3): 113–120 https://pubmed.ncbi.nlm.nih.gov/19727440/ ....................................................................15, 22

**DEFENDANTS' CENTRAL CITY CONCERN AND LETTY OWINGS CENTER OPPOSITION TO THE UNITED STATES MOTION TO DISMISS**

Defendants Central City Concern ("CCC"), a "federally-supported" health center, and Letty Owings Center ("Letty Owings")—a federally-approved CCC service delivery site and Oregon-licensed residential treatment facility—are entitled to absolute immunity from plaintiffs' claims under 42 U.S.C. § 233. Accordingly, CCC and Letty Owings hereby oppose Section I of the United States' motion to dismiss and respectfully request that the Court deny that portion of the United States' motion to dismiss.[1] CCC and Letty Owings do not, and cannot, take any position on Section II of the United States' motion, which asserts dismissal is warranted by substantive and procedural aspects of the FTCA and, accordingly, concerns only the rights and liabilities of the plaintiffs and the United States.

## INTRODUCTION

Having deemed CCC and, by extension, Letty Owings[2] and its personnel, to be federal employees during the period at issue, the government—now called to make good on its promise of absolute immunity—may neither retroactively strip defendants of their deemed status, nor renege on the assurances it previously provided. Contrary to the United States' motion, the United States is indeed the proper—and only—defendant here, as plaintiffs' claims result from a federally-supported health centers' performance of medical or related functions within the scope of its deemed federal employment, meeting the requirements of 42 U.S.C. § 233.

The United States motion attempts a sleight of hand: by narrowly defining the immunity right at issue, the motion sets the stage to find, unsurprisingly, that the right can't apply here. The

---

[1] CCC and Letty Owings have also filed a Motion to Substitute, ECF No. 32, to vindicate their federal immunity rights. The Motion to Substitute and this Response to the United States Motion to Dismiss are presented separately in accordance with Local Rule 7-1(b).

[2] CCC and Letty Owings are a single legal entity.

trick begins by redefining the purpose of 42 U.S.C. § 233 as having the "singular goal of relieving certain grantees of the 'burden of rising malpractice insurance costs,' U.S. Br., ECF. No. 26, at 8 (citing *El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1268 (D.C. Cir. 2005)). But that is not what the cited case, or any authority, provides. And no wonder, as the boundaries the United States draws around the right have no basis in the plain language of the governing statute.

Undeterred, the United States continues its illusion. It reads the relevant statutory language through the distorted "singular purpose" lens as imposing two requirements—fatal here of course—that its plain language simply does not impose. First, the United States asserts that deemed health centers are not, in fact, immune from "any . . . civil action or proceeding" "resulting from the[ir] performance of medical, surgical, dental, or related functions," but are instead only immune from claims brought by their patients. Second, and alternatively, the United States argues that immunity applies not to "any" action or proceeding as the text commands but instead only to medical malpractice claims—a term absent from the immunity granting provision of 42 U.S.C. § 233 and undefined by the statute as a whole.

A clear-eyed reading of the statute and unbiased examination of the facts strip away the artifice: the United States is the sole proper defendant and must be substituted for CCC and Letty Owings in name, place, and stead with respect to the claims raised against them in Plaintiff's complaint. Accordingly, the Court must deny Section I of the United States' motion to dismiss.

## LEGAL AND REGULATORY BACKGROUND

The Secretary of HHS has authority under the Public Health Service ("PHS" Act) to provide grant funding to community-based health centers that offer primary and other health care and related services in medically underserved areas and to special populations including, as

relevant here, homeless individuals. 42 U.S.C. § 254b(a)(1) (defining "health center" as "an entity that serves a population that is medically underserved, or a special medically underserved population comprised of . . . the homeless . . . by providing" a set of enumerated "required primary health services" and "additional health services . . . necessary for the adequate support of the [required] primary health services"), (h)(1) (authorizing "grants for . . . the planning and delivery of services to a special medically underserved population comprised of homeless individuals").

In 1992, Congress amended the PHS Act to extend the immunity the act then afforded to PHS employees to health center grantees and their employees by authorizing the HHS Secretary to "deem" those entities and individuals to be PHS employees for purposes of the immunity afforded under § 233(a). *See* Federally Supported Health Centers Assistance Act (hereinafter "FSHCAA") of 1992, Pub. L. 102-501, 106 Stat. 3268 (1992); *see also* H.R. Rep. No. 102–823, pt. 1 (1992), *reprinted in* 1992 U.S.C.C.A.N. 2627. The HHS deeming decision affords a federal status and immunity from any action or proceeding "resulting from the performance of medical, surgical, dental, or related functions" performed "within the scope of . . . [the deemed federal] employment." 42 U.S.C. § 233(a); *see Estate of Booker v. Greater Phila. Health Action*, 10 F. Supp. 3d 656, 658 (E.D. Pa. 2014). The FHSCAA initially authorized a three-year demonstration project, effective from January 1993 through December 1995, to determine whether extension of PHS Act immunity to health centers and their personnel would result in cost savings and greater allocation of federal funds to the provision of services. *See* Health and Human Services, Office of the Inspector General, *Cost to the Government for Providing Medical Malpractice Coverage to Community and Migrant Health Centers* 3, (Mar. 25, 1996).

In 1995, Congress amended the FSHCAA to make it permanent and to resolve concerns that arose during the demonstration period. Federally Supported Health Centers Assistance Act of 1995, Pub. L. 104-73, 109 Stat. 777 (1995). The statutory subsections added to the FSHCAA in 1995—§ 233(g)(1)(D)–(F), (*l*)(1)–(2)—were designed to: (1) encourage increased use of the program by health centers; and (2) ensure deemed defendants' access to a federal forum in which to assert the absolute immunity afforded to them by federal law. *See* H.R. Rep. No. 104–398, at 6, 7 (1995), *reprinted in* 1995 U.S.C.C.A.N. 767, 769–70. To accomplish these congressional purposes, the 1995 amendments established a prospective coverage process under § 233(g)(1)(D)–(E), the result of which is "final and binding" on the government in any subsequent judicial proceedings. 42 U.S.C. § 233(g)(1)(D)–(E) (requiring health center deeming application), (F) (making agency deeming determinations "final and binding" on the agency, DOJ, and other parties in subsequent suits, and prohibiting HHS and DOJ from determining "that the provision of services which are the subject of such a determination are not covered under this section").

When assessing immunity under 42 U.S.C. § 233, federal courts follow the "ordinary rules of evidence and procedure." *Hui v. Castaneda*, 559 U.S. 799, 811 (2010); *accord Garcia v. Ives*, No. 3:18-CV-0176-HZ, 2020 WL 6323934, at *6 (D. Or. Oct. 25, 2020) ("[S]cope of employment certification by the Attorney General is not a prerequisite to immunity under § 233(a); instead, a defendant may make that proof pursuant to the ordinary rules of evidence and procedure.") (internal quotation marks omitted). Where appropriate, substitution of the United States vindicates deemed health centers' statutory right to absolute immunity. *See Agyin v. Razmzan*, 986 F.3d 168, 184 (2d Cir. 2021); *Estate of Booker*, 10 F. Supp. 3d at 670 (ordering substitution in case removed to federal court); *Mixon v. CareSouth Carolina, Inc.*, No. 22-cv-

00269, 2022 WL 1810615, at *4–8 (D.S.C. June 2, 2022) (same); *C. K. v. United States*, No. 19-cv-2492, 2020 WL 6684921, at *3, *7 (S.D. Cal. Nov. 12, 2020) (ordering substitution in case originating in federal court); *see also Saucier v. Katz*, 533 U.S. 194, 200-201 (2001) ("an immunity from suit rather than a mere defense to liability … like an absolute immunity … is effectively lost if a case is erroneously permitted to go to trial") *(citing Mitchell v. Forsyth*, 472 U. S. 511, 526 (1985); *Hunter v. Bryant*, 502 U. S. 224, 227 (1991) (*per curiam*) (hence, the Court has "repeatedly [] stressed the importance of resolving immunity questions at the earliest possible stage in litigation").

Section 233(a) immunity, as intended, facilitates the provision of medical services in underserved areas by shielding both deemed and actual PHS personnel from costly personal liability—and the attendant cost of professional liability insurance—arising out of their medical and related duties. *See* Pub. L. 91-623, § 2, 84 Stat. 1868 (1970); H.R. Rep. No. 91-1662, at 1, *reprinted in* 1970 U.S.C.C.A.N. 5775; 116 Cong. Rec. 42,543 (1970) (Rep. Staggers, House sponsor, observing PHS physicians "cannot afford to take out the customary liability insurance as most doctors do," "because of the low pay that so many of those who work in the [PHS] receive"); 141 Cong. Rec. H14276 (statement of Rep. Wyden) ("The bill allows [community health center]'s to reallocate desperately needed health care dollars from the coffers of private medical malpractice insurance companies to direct services for hundreds thousands more poor and rural Americans."), *see* H.R. Rep. 102-823, pt. 1, at 3 (1992).

The absolute immunity CCC applied for and received—for all sites and personnel, including Letty Owings and its staff—is broadly set forth in a single statutory provision to eliminate any uncertainty that it fully replaces health centers' need for costly private professional malpractice insurance. The immunity unambiguously applies to "any . . . action or proceeding"

"resulting from the performance of medical . . . or related functions" undertaken within the scope of the deemed federal employment. 42 U.S.C. § 233(a).

**FACTUAL AND PROCEDURAL HISTORY**

Defendant Central City Concern ("CCC") is an Oregon non-profit, tax-exempt organization that receives federal funding under Section 330 of the PHS Act, *codified at* 42 U.S.C. 254b, to provide medical care and related services to individuals experiencing homelessness in the Portland metropolitan area. CCC Service Area Competition Project Narrative, Ex. 1, at 1. Defendant Letty Owings is a federally-approved CCC service delivery site that has, since 1989, provided residential substance use disorder treatment and related health care and enabling services to women and their young children. *See* CCC Section 330 Grant Application, Form 5B, Ex. 2, at 5 (indicating Letty Owings operates as a 24/7 service delivery site added to CCC's HRSA scope of project in January 1989); *see also* Oregon State License, Ex. 3, (evidencing Letty Owings' status during the period in question as an Oregon state licensed alcohol and drug residential treatment facility); *see also* Ex. 1 at 15, 33–34 (indicating low-income women and single mothers in CCC's service area are especially susceptible to poverty, eviction, and the deleterious mental health impact of both). Due to its focus on a homeless patient population, CCC is required by statute to provide such residential treatment services. 42 U.S.C. § 254b(h)(2), (5)(B).[3] As a further condition of its receipt of grant funding, CCC must

[3] The terms "substance abuse services" and "substance use disorder services" in § 233(h)(2) and (h)(5)), respectively, are interchangeable. In 2018, Congress amended § 254b by striking the word "abuse" and replacing it with "use disorder" in subsections 254b(1)(A)(ii), (2)(A), and (h)(5), and used the "substance *use disorder*" phrase in a then-new iteration of subsection 254b(d). *See* Bipartisan Budget Act of 2018, Pub. L. No. 115-123, § 50901(b), 132 Stat 64 (2018). Leaving § 254b(h)(2) untouched was undoubtedly a scrivener's error, as the terminology shift is otherwise consistent and follows a deliberate effort to avoid stigmatizing labels, such as "abuse." *See*, *e.g.*, Michael P. Botticelli & Howard K. Koh, *Changing the Language of*

provide care regardless of any patient's ability to pay for its services. 42 U.S.C. § 254b(k)(3)(G)(iii).

At all times relevant to plaintiff's action, HHS, pursuant to 42 U.S.C. § 233(g) and (h), had deemed CCC and its employees, including Letty Owings personnel, to be PHS employees for purposes of the immunity afforded by 42 U.S.C. § 233(a). *See* Ex. 4 (HHS notices of deeming action, calendar years 2019 and 2020, reflecting HHS's favorable deeming determinations); Ex. 5 (CCC deeming application, including its Letty Owings service site).

Plaintiff Nicole Moretti was a CCC patient and Letty Owings resident during the period in which plaintiffs' claims arose. Ms. Moretti was admitted to Letty Owings in early August 2019. Decl. of Amanda Risser, MD ("hereinafter "Risser Decl."), Ex. 6, ¶ 12. Her admission record indicates she was experiencing homelessness at that time and sought residence and substance use disorder treatment at Letty Owings late in pregnancy out of a desire to maintain custody of her child post-partum and to be a responsible mother. Risser Decl., Attachment 1, Ex. 6A at 1, 5, 11, 18.[4]

While a Letty Owings resident, Ms. Moretti, in addition to substance use disorder treatment, received general care coordination, medication review and management, and routine nursing care—provided by registered nurse ("RN") staff in coordination, as necessary, with Letty Owings' Medical Director—for, at various times, medical issues including , pain, dental

*Addiction*, 316 JAMA 13, at 1361–62 (2016); Diagnostic and Statistical Manual of Mental Disorders (5th ed., 2013).

[4] Plaintiffs, via counsel, have authorized the filing of these records and those included in Risser Decl., Attachment 2, Ex. 6B, which constitute relevant excerpts of Nicole Moretti's and Saylor Moretti's medical records, respectively.

problems, edema, nausea and vomiting, and smoking cessation assistance. Risser Decl. Attachment 1 at 2–4, 5–6.

Ms. Moretti gave birth to Saylor via emergency C-section on September 7, 2019. Am. Compl., ECF No. 19, ¶ 1; Risser Decl. Attachment 1 at 2, 12–22. Following Saylor's birth, Ms. Moretti returned to Letty Owings to continue her residential treatment. Just as she had while pregnant, Ms. Moretti continued, after Saylor's birth, to receive medical care from Letty Owings staff in coordination with her primary care provider and other providers. Risser Decl. Attachment 1 at 19–20, 21–22. As a new mother, Ms. Moretti received additional care from Letty Owings staff related to her post-partum condition and to Saylor's interdependent health and wellbeing, including counseling and behavior management related to safe sleeping, a crucial mitigation against sudden unexpected infant death ("SUID") risk and a core component of maternal-infant care. Risser Decl. ¶¶ 11, 13–14; *see also* Risser Decl. Attachment 1 at 2.

Following his birth, Saylor, like Ms. Moretti, received medical and related services from Letty Owings' medical personnel. His care included general case management and monitoring, as well as evaluation, treatment, and care coordination related to complaints such as fever and congestion. Risser Decl., Attachment 2, Ex. 6B.

Saylor Moretti died on October 4, 2019. Plaintiffs allege his death occurred "when Nicole Moretti's weight came to rest or press against Saylor in such a way as to prevent his adequate breathing" while the two shared a bed. Am. Compl. ¶ 12.

On October 9, 2019, in response to Saylor's death, the Oregon Department of Health visited and evaluated Letty Owings, with particular attention to the Center's policies and practices related to resident co-sleeping. Ex. 7 at 2. The site visit resulted in no identified areas of noncompliance. *Id.* at p. 4.

On May 3, 2022—following the plaintiffs' filing of both this suit and an administrative tort claim—Assistant United States Attorney Michael Jeter notified CCC, purportedly on behalf of HHS, that "[t]he [HHS] Secretary has determined that it shall not extend coverage to defendants Central City Concern and Letty Owings Center ("Defendants"), with respect to the actions and omissions that are the subject of this civil action because the allegations comprising Plaintiffs' claims do not arise out of medical malpractice." Letter from Michael Jeter, Assistant U.S. Att'y to Central City Concern (May 3, 2022); Ex. 8 (Letter from Jennifer B. Smith, Acting Deputy Associate General Counsel, Office of the General Counsel, U.S. Dep't of Health & Hum. Servs., to Rachel Solotaroff, Chief Executive Officer, Central City Concern, Ex. 9 at 1 (noting Wendy Novins' filing of Administrative Tort Claim No. 2021-0365 as personal representative for the estate of Saylor Moretti). DOJ's reasoning that the claims fall outside the scope of section 233(a) immunity hinges on its legal conclusion that "Plaintiffs' claims arise out of injuries resulting from an alleged breach of a general duty imposed on premises owners to individuals like Plaintiffs, not medical malpractice." Ex. 8. The United States' motion to dismiss, to which this memorandum responds, followed.

## ARGUMENT

The United States is the sole proper defendant; accordingly, the Court should deny Section I of the United States' Motion to Dismiss, ECF No. 26. CCC and Letty Owings meet all 42 U.S.C. § 233 requirements for immunity to apply with respect to plaintiffs' claims: they and their personnel were deemed to be federal employees during the period in question, there is no allegation they acted outside the scope of their deemed federal employment, and plaintiffs' claims result from Letty Owings' provision of medical and related services. 42 U.S.C. § 233(a), (g). The United States, unable to refute that these elements are met, conjures new requirements.

But the statute's plain language—correctly interpreted time and again—neither limits immunity to only the claims of established patients nor limits immunity to claims meeting a particular state's definition of medical malpractice.

## I. The United States is the Sole Proper Defendant Because CCC and Letty Owings Are Immune from Plaintiffs' Claims

The Court should deny Section I of the United States Motion to Dismiss because, as explained in CCC's and Letty Owings' concurrently filed Motion to Substitute, ECF No. 32, the United States is the sole proper defendant in this matter and should be substituted for CCC and Letty Owings. Substitution is the means to vindicate the immunity rights CCC and Letty Owings enjoy under 42 U.S.C. § 233. As provided in its Motion to Substitute, CCC and its personnel—including Letty Owings and its employees—meet all statutory requirements for immunity to apply: the HHS Secretary prospectively deemed them, in a final and binding decision, to be PHS employees during the relevant period; they acted within the scope of their deemed federal employment with respect to the alleged acts and omissions underlying plaintiffs' claims; and plaintiffs' claims—premised on alleged failures in staffing, training, and supervision—result from deemed PHS defendants' performance of medical or related functions. 42 U.S.C. § 233(a), (g); *see generally* ECF No. 32.

The FSHCAA provides absolute immunity to certain federally-supported health centers and their personnel—including not only medical providers, but also officers, directors, board members, and all employees—by authorizing the HHS Secretary to deem health centers and their staff to be PHS employees for purposes of § 233(a). 42 U.S.C. § 233(a), (g). "Once the Secretary makes a determination that an entity … is deemed to be an employee of the Public Health Service for purposes of [§ 233], the determination [is] … final and binding upon the Secretary and the Attorney General and other parties to any civil action or proceeding." 42 U.S.C. §

233(g)(1)(F). Both actual and deemed PHS employees thus enjoy "absolute immunity . . . for actions arising out of the performance of medical or related functions within the scope of their employment." *Hui v. Castaneda*, 559 U.S. at 806 (2010).

It is axiomatic that waivers of sovereign immunity—such as the FTCA— are to be strictly construed. But § 233(a) is neither a provision of the FTCA, nor a waiver of sovereign immunity. It is, instead, a grant of absolute immunity, which confers an individual federal right to be free from the burdens of litigation altogether, regardless of the scope of the exclusive remedy (here, the FTCA). *See Mitchell*, 472 U.S. at 525 ("the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action."). The two concepts—sovereign immunity and individual immunity—are not only logically and legally distinct, but the former (which applies to a limited remedy under the FTCA) does not restrict the latter (which applies to any action arising out of the performance of "medical … and related functions"). 42 U.S.C. § 233(a).

In contrast to the narrow nature of sovereign immunity, the PHS act employs broad and unequivocal terms to provide PHS personnel with absolute immunity from the wide range of claims that can arise out of a health care entity's and/or provider's "performance of medical, surgical, dental, or related functions," by making the remedy under the FTCA (*i.e.*, a claim against the United States) "exclusive of any other civil action or proceeding by reason of the same subject-matter." § 233(a) (emphasis added). The provision's exclusivity is stated in similarly sweeping language: the remedy afforded is "exclusive of *any other* civil action or proceeding by reason of the same subject-matter against the [PHS employee] whose act or omission gave rise to the claim." 42 U.S.C. § 233(a) (emphasis added).

The immunity-granting provision's covered conduct is likewise stated in broad terms—that is, "medical, surgical, dental, and related functions." *Id.* Not only is each specified function a broad concept, the term "related functions" further expands the enumerated, covered functions to include ancillary functions. *See Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (ordinary usage of words "related to" means to broaden and expresses a broad purpose). Indeed, the one illustration of a "related function" specified in the statute—"the conduct of clinical studies or investigations," § 233(a), (e)—reinforces the breadth of the covered conduct. *See K.R. v. Silverman*, No. 08-cv-2192, 2009 WL 2959580, at *7 (E.D.N.Y. 2009); *Trap v. United States*, No. CV-13-00003, 2016 WL 6609212, at *3–4 (C.D. Cal. Mar. 7, 2016) (recognizing § 233(a) immunity for a PHS employee who, in retaliation to federal prisoner's complaints, allegedly instructed guards to withhold food and water from prisoner whenever prisoner left the prison to receive medical treatment); *Z.B. v. Ammonoosuc Cmty. Health Servs., Inc.*, No. Civ. 03–540(NH), 2004 WL 1571988, *4 (D. Me. June 13, 2004) (phrase "related to" in agency's FSHCAA regulation, 42 CFR § 6.6(d), recognizes that § 233(a) immunity extends beyond the mere act of providing medical care).

## II. The United States' Arguments Against Immunity and Substitution are Without Merit

The United States' erroneous assertion that § 233 immunity does not cover this civil action—and that the claims against it must therefore be dismissed for lack of subject matter jurisdiction—is based on inaccurate facts and incorrect legal conclusions. First, the assertion that immunity is unavailable because Saylor Moretti received no medical care from CCC or Letty Owings personnel is both factually inaccurate and legally flawed—Saylor did in fact receive care from Letty Owens medical personnel during his short life, and § 233 would provide CCC and Letty Owings immunity from his claims even if he didn't, as nothing in the statute's text limits

its grant of absolute immunity to claims brought by certain categories of plaintiffs. Second, the United States attempts to escape substitution by characterizing plaintiffs' complaint—with little explanation—as setting forth a claim based on "premises liability" rather than medical malpractice. But it is well established that the immunity at issue is not limited to medical malpractice actions, or, indeed to any particular type of claim or theory of liability, but instead broadly covers "*any* action or proceeding" arising out of the performance of medical or related functions. 42 U.S.C. § 233(a) (emphasis added).

**A. Immunity is not Limited to Claims of Health Center Patients**

Contrary to the United States' arguments, nothing in the text of § 233 limits immunity to only those claims brought by patients. Instead, the "broad" and "comprehensive" immunity § 233 confers hinges on defendants' conduct—*i.e.*, their performance of medical or related functions within the scope of their deemed employment. *Hui* 559 U.S. at 806, 810 (construing 42 U.S.C. § 233(a)); *cf. Mitchell*, 472 U.S. at 527 (recognizing federal immunity is an "entitlement not to be forced to litigate the consequences of official *conduct*" and noting "claim of immunity is conceptually distinct from the merits of the plaintiff's claim") (emphasis added). The United States is also wrong on the facts: Saylor Moretti, as a Letty Owings resident, was indeed also its patient, *i.e.*, a recipient of medical and related services from Letty Owings staff.[5]

When Congress initially extended § 233(a) immunity to deemed PHS employees under the FSHCAA of 1992, and again as amended in 1995, it mandated that they would be immune to

[5] Plaintiffs' Amended Complaint also appears to set out a claim on behalf of Nicole Moretti. *See, e.g.*, Am. Compl. ¶ 13, ECF No. 19 ("The Letty Owings Center was in all ways responsible for providing a residential care facility that was appropriate to the needs of Ms. Moretti . . ."). Although that claim may be vulnerable to substantive and procedural challenges under Oregon law, it is undisputed that Ms. Moretti was a CCC/Letty Owings patient, and any such challenges are for the proper defendant to raise following the Court's threshold immunity determination.

the "same extent" as actual PHS employees. 42 U.S.C. § 233(a), (g)(1)(A). The United States skips past the text of § 233(g)(1)(A) and misreads the next two (later enacted) subsections, § 233(g)(1)(B) and (C) (1995), as purportedly authorizing the "deeming [of eligible health centers] to be PHS employees *only for purposes of services to patients of the entity.*" U.S. Br. at 10 (internal quotations omitted, emphasis added). But neither statutory subsection on which the United States relies, § 233(g)(1)(B) or (C), imposes such a limitation, and the United States' reading would defeat the statute's mandated equivalency.[6]

Read properly, § 233(g)(1)(B) and (C) provide health centers and their personnel with a mechanism—the deeming process—through which to seek and obtain advance confirmation as to whether, and which, services rendered outside the health center's own facilities—including to nonpatients at the time of service—are nonetheless within the scope of health centers' deemed employment. 42 U.S.C. § 233(g)(1)(B), (C); *accord* 42 C.F.R. § 6.6(d), (e) (providing examples of situations in which "acts and omissions related to services provided" to individuals outside of the health center's HRSA-approved service sites will qualify for immunity, e.g., school-based services, cross-coverage agreements, and immunization campaigns); *see also Agyin*, 986 F.3d at 186 ("The regulation [at 42 C.F.R. § 6.6(c), (d)] . . . restates the proposition that the FSHCAA provides immunity only for conduct undertaken within the scope of the defendant's employment."). The text's focus is wholly on conduct, with no regard for claimant identity.

[6] Had Congress wished to limit § 233(a) immunity for deemed PHS employees it could have easily done so by, for example, amending § 233(g)(1)(A) to such that the "remedy against the United States … shall be exclusive of any civil action or proceeding, provided that such action or proceeding is brought by a patient of the entity for services the entity provided to the patient." It did not.

Because the statute as a whole immunizes certain conduct—the provision of medical, dental, surgical, and related services—immunity could apply here even in the absence of a patient-provider relationship between Saylor and Letty Owings' medical personnel. But the United States is also wrong about the facts, incorrectly asserting that (1) it "provided no medical care to its residents' children" and (2) "Saylor Moretti was not a patient" of CCC or Letty Owings. U.S. Br. at 10–11. Neither statement is true.

First, Letty Owings provides medical and related services, within the meaning of § 233, to its child residents from intake through the duration of the child's stay, offering its "case management, counseling, medication help (management), and related services to individuals, couples, *and families*." *See*; Risser Decl., Attachment 3, Ex. 6C, at 1 ("Open Red Chart Checklist" indicating provision of safety planning and other services specific to children), 7; *see* Risser Decl. ¶ 9. At intake, children are enrolled in the program via separate documentation and provided with safety planning services as applicable. *Id.* at 1, 161. Throughout a child's stay, he or she receives medical and related services, as needed, including care coordination, medication management, infectious disease control and treatment, and triage. *Id*. at 43, 129, 137, 175; Risser Decl. ¶ 9.

Children's health needs at Letty Owings are, unsurprisingly, met through providers' coordination with children's mothers. *See* Risser Decl. ¶¶ 5, 9, 11, 13; *see also* SAMHSA, *Substance Abuse Treatment: Addressing the Specific Needs of Women: A Treatment Improvement Protocol*, SAMHSA (2013) (noting "[w]omen in recovery see the support of their children as an essential ingredient for their recovery" and suggesting "[T]reatment services for women must . . . address specific needs for women, pregnant women, and women with children such as medical services, health promotion, life skills, family- and child-related treatment

services, comprehensive and coordinated case.") (citing Tracy, E.M., and Martin, T.C. *Children's Roles In The Social Networks Of Women In Substance Abuse Treatment*, Journal of Substance Abuse Treatment 32(1):81–88, (2007)); Velez, M. & Jansson, L.M., *The Opioid Dependent Mother And Newborn Dyad: Nonpharmacologic Care*, J Addict Med. 2008 September 1; 2(3): 113–120, doi:10.1097/ADM.0b013e31817e6105, https://pubmed.ncbi.nlm.nih.gov/19727440/ ("An essential component of non-pharmacologic care is the education and facilitation of maternal involvement with the infant.").[7] For example, women arriving with children—or, like Ms. Moretti, returning to Letty Owings with a newborn—meet with and receive counseling from a Letty Owings nurse on safe sleep protocols. Risser Decl., Attachment 3 at 165, 205–209 (safe sleep materials); Risser Decl. ¶¶ 11, 14. Letty Owings provides mothers of infants with "a bassinet or crib for [the] baby to use for sleeping," and informs its residents at admission that:

> For your child's safety staff will do room checks every night. If you are sleeping with your baby in your bed, staff will wake you up and have you move the baby to a crib or bassinet. Our staff is here to assist you in learning about safe sleep as well as support you with breastfeeding and any other questions you have.

Risser Decl., Attachment 3 at 169–71; Risser Decl. ¶ 11 ("Safe sleeping education and guidance are considered important mitigation against sudden unexpected infant death"). Additionally,

---

[7] HHS has long supported dyadic care in residential treatment programs. *See*, *e.g.*, Alcohol, Drug Abuse, and Mental Health Administration Reorganization Act of 1992, Pub. L. 102-321, 106 Stat 323, (July 10, 1992), § 108, Programs for Pregnant and Postpartum Women, *codified at* 42 U.S.C. § 290bb-1 (authorizing HHS grant funds for "public and nonprofit private entities for the purpose of providing to pregnant and postpartum women treatment for substance abuse through programs in which … the women reside in facilities provided by the programs … [and] the minor children of the women reside with the women in such facilities, if the women so request"); SAMHSA, Services Grant Program for Residential Treatment for Pregnant and Postpartum Women, https://www.samhsa.gov/grants/grant-announcements/ti-22-003; *see also, generally* National Center for Children in Poverty, *Dyadic Treatment*, https://www.nccp.org/dyadic-treatment.

while residing at Letty Owings, each mother explicitly agrees via a "child care contract" to "authorize LOC staff to obtain medical assistance and to administer first aid and/or CPR for [her] child . . . including but not limited to emergent [situations] or otherwise." Risser Decl., Attachment 3, at 129. Each mother also agrees to "follow all LOC guidelines related to the health of [her] child." *Id*. In addition to physical health, children's behavioral health needs are also assessed and met during residence: Letty Owings assures its adult residents at intake that "[i]f, at any point, there is an indication that a child may have special needs, Letty Owings Center will inform the child's parent and make contact with the nurse for assessment and assistance." *Id.* at 43.

Second, Saylor Moretti, like other Letty Owings resident children, received medical care and related services from Letty Owings personnel, including its Registered Nurses and Medical Director. *See, e.g.,* Risser Decl., Attachment 2. In keeping with Letty Owings dyadic model of care, many of the medical and related services Letty Owings provided to Ms. Moretti were focused not only on her personal health and wellbeing, but also on the interdependent health of Saylor, her infant son. In addition to safe sleep counseling, monitoring, and—where appropriate—intervention, Letty Owings provided behavioral health counseling related to parenting, enabling services including WIC access, and breastfeeding support. *See, e.g.,* Risser Decl. Attachment 1, at 19–20 (indicating RN counseling and care coordination related to breastfeeding and discussion of "benefits of [smoking] cessation for client and newborn); Risser Decl. Attachment 2, at 2 (evidencing nurse's encouragement of "skin to skin [contact between Nicole and Saylor] to promote attachment/protect against w/d," discussion of "'eat, sleep, console'" as protective against [neonatal abstinence syndrome]," and counseling related to breastfeeding, supplementing Saylor's nutritional needs with formula, and diaper rash

avoidance), 24–25 (evidencing WIC counseling and enabling assistance); *cf.* Kate Margolis, et. al., *Babies Don't Go to the Doctor by Themselves: Innovating a Dyadic Behavioral Health Model to Serve the Youngest Primary Care Patients and Their Families*, https://cachildrenstrust.org/wp-content/uploads/2020/05/Dyadic_final_May2020.pdf.

### B. Immunity Covers "Any" Action Or Proceeding Resulting From Covered Conduct, And Is Not Limited To Medical Malpractice

The absolute immunity at issue here applies to any claim, however characterized, where the underlying conduct allegedly giving rise to it meets statutory criteria. The United States wrongly asserts that immunity applies only to claims of medical malpractice, U.S. Br. at 11, and proclaims, with little explanation or analysis, that plaintiffs' complaint sets out a "premises liability" claim outside the scope of § 233(a) immunity. U.S. Br. at 5, 11; Ex. 8.

Nothing in the law indicates that the federal immunity right at issue turns on the idiosyncrasies of state medical malpractice laws or is cabined by creative pleading or post-hoc characterization. Instead, the right is broad and comprehensive, making the FTCA the exclusive remedy for all actions or proceedings against PHS employees arising out of their performance of medical or related functions, regardless of the label applied to a particular claim, and without regard to whether the claim is ultimately viable or compensable under the FTCA. *Hui*, 559 U.S. at 806. The Supreme Court, squarely confronting the scope of § 233(a) immunity, unanimously rejected the contention that § 233(a) immunity is limited to medical negligence actions. *See id.* at 806. Noting "[t]he breadth of the words 'exclusive' and 'any,'" as well as "the provision's inclusive reference to all civil proceedings arising out of 'the same subject-matter,'" the Supreme Court concluded that the statute expressly captures "any" civil action or proceeding alleging professional misfeasance or dereliction arising out of the performance of medical or related functions. *See id.* at 806 (concluding § 233(a) immunity extends to constitutional claims arising

from the provision of medical care or related functions). Indeed, the Court noted that the expansive language Congress used in § 233(a) "easily accommodates both known and unknown causes of action" premised on qualifying acts and omissions. *Id.* at 806. (concluding *Bivens* claim qualified for § 233(a) immunity even though such claims post-dated the passage of § 233(a)).

Lower courts have likewise correctly read the statute and concluded that deemed health centers are immune from any and all claims arising out of their performance of medical, surgical, dental, and related functions performed within the scope of their deemed federal employment regardless of the label applied to a particular claim. *See, e.g., Pomeroy v. United States*, No. 17-cv-10211, 2018 WL 1093501, at *3–4 (D. Mass. Feb. 27, 2018) (rejecting government position that claim was for "negligent provision of food" and concluding deemed health center's execution of treatment plan qualified for immunity when nurse, contrary to care plan, provided solid food to patient with known swallowing disability); *Pinzon v. Mendocino Coast Clinics Inc.*, No. 14-cv-05504, 2015 WL 4967257, at *3 (N.D. Cal. Aug. 20, 2015) (applying *Hui* and concluding § 233(a) extends beyond medical negligence claims to cover alleged violations of the Americans with Disabilities Act, HIPAA, and Civil Rights Act of 1964); *De La Cruz v. Graber*, No. 16-cv-1294, 2017 WL 4277129, at *3–4 (C.D. Cal. June 15, 2017), *report and recommendation adopted*, 2017 WL 4271122 (C.D. Cal. Sept. 21, 2017) (concluding medical administrator, whose performance of administrative duties gave rise to constitutional tort claim, was immune under § 233(a)).

There should be no genuine question that plaintiffs' claim arose from alleged acts and omissions of a medical—or at the very least, related nature—performed within the scope of Letty Owings' deemed federal employment. Plaintiffs' complaint facially alleges professional

negligence or malpractice. In particular, plaintiffs allege personal injury and wrongful death arising from Letty Owings' purported failures to maintain appropriate policies to avoid co-sleeping, provide adequate staff to prevent co-sleeping, provide a safe sleep surface for Saylor Moretti, and adequately monitor, train, and supervise staff to prevent co-sleeping and attendant medical risks. Am. Compl. ¶ 14. At the heart of all acts and omissions alleged is the purported failure to provide "residential care" appropriate to the "needs" of both Nicole and Saylor Moretti, including the "management" and "supervision" of their sleeping environment "to avoid the known risk of co-sleeping—where a parent and child fall asleep in the same bed." *Id.* ¶ 13.

The provision of "residential treatment" for substance use disorder from which plaintiffs' claims arise is itself a "medical" function inherently involving various component medical and related functions. 42 U.S.C. § 233(a). The statute under which CCC is eligible for deemed PHS status—42 U.S.C. § 254b—defines "residential treatment" for substance use disorders as one of various "primary health services" all health centers focused on treating homeless patient populations must provide as a condition of their receipt of grant funding. *Id*. at § 254b(h)(2), (h)(5)(B); *see also* 42 U.S.C. § 233(g)(4) (defining entities eligible for deeming as those receiving funds under § 254b). As a federal grantee, CCC must operate Letty Owings, a residential treatment facility, "in compliance with applicable Federal, State, and local laws and regulations." 42 C.F.R. § 51c.304(d)(v). The Oregon Health Authority licenses residential treatment facilities to provide "assessment, treatment, rehabilitation, and *twenty-four hour observation and monitoring* for individuals with substance use dependence, consistent with Level III of [American Society of Addiction Medicine Patient Placement Criteria]." *See* Or. Admin. R. 309-018-0105(74); Medicaid Innovation Accelerator Program, (April 2017) https://www.medicaid.gov/state-resource-center/innovation-accelerator-program/iap-

downloads/reducing-substance-use-disorders/asam-resource-guide.pdf (defining Level III including "four sublevels that represent a range of intensities of service. The uniting feature is that these services all are provided in a structured, residential setting that is staffed 24 hours daily and are *clinically managed*") (emphasis in original). In keeping with Oregon Health requirements, Letty Owings provides, among other care and services, "the planned, *medically appropriate*, individualized program of medical, psychological, and rehabilitative procedures, experiences and activities designed to *remediate symptoms of a DSM diagnosis* that are included in the Service Plan." Or. Admin. R. 309-018-0105(93) (emphasis added). To perform its residential treatment function, Letty Owings uses an interdisciplinary team of health care professionals, including an onsite medical director physician, registered nurses, addictions counselors, social workers, licensed professional counselors, and allied health professionals who provide treatment assistance and residential oversight. Risser Decl. ¶ 5.

The approach a residential treatment facility, which is designed and intended to serve mothers of young children, takes to sleeping arrangements is integral to its provision of residential treatment and is a "medical" or, at the very least, "related function." Maternal-child sleeping arrangements are indisputably the subject of medical literature, debate, and, expert testimony. *See, e.g., Bohn ex rel. G.B. v. Sec'y of Health & Hum. Servs.*, No. 16-0265V, 2021 WL 4302367, at *6, 8, 10 (Fed. Cl. Aug. 23, 2021) (considering dueling experts' testimony pitting view that "co-sleeping is not a cause of death" against opinion that "infant asphyxia is a well-known complication of bed-sharing with adults, and bed-sharing is a well-known risk factor for SIDS.") (internal quotation omitted); *Downing-Powers v. Sec'y of Health & Hum. Servs.*, No. 15-1043V, 2020 WL 4197303, at *3 (Fed. Cl. June 2, 2020) (citing expert testimony and well-established medical literature considering the impact of co-sleeping on SIDS risk); *see also*

National Institute for Health and Care Excellence (NICE), *Postnatal Care: Co-sleeping Risk Factors*, NICE Guideline No. 194 (Apr. 2021), https://www.ncbi.nlm.nih.gov/books/NBK571558/ (providing meta-analysis of SUID risk related to co-sleeping "to clarify the nature of risk, if any, *and enable healthcare professionals to advise parents on safe sleeping practices*") (emphasis added); Centers for Disease Control and Prevention, *Vital Signs*, *Safe Sleep for Babies: Eliminating Hazards*, https://www.cdc.gov/vitalsigns/safesleep/index.html (noting role of health care providers in advising patients on safe sleep, overcoming patient adherence challenges, and modeling safe sleep practices); Oregon Health Authority, *Safe Sleep for Babies*, *About SUID and SIDS*, https://www.oregon.gov/oha/ph/healthypeoplefamilies/babies/pages/sids.aspx (providing safe sleep guidance and advising public to "talk to your healthcare provider about any concerns you may have" related to safe sleep practices).

Co-sleeping policies and their implementation involve professional decision-making and thus easily fall within the realm of professional malpractice actions. They are also at the heart of Letty Owings' dyadic approach to concurrently addressing the interdependent health needs of both mother and child. Risser Decl. ¶ 6 (providing that "[s]afe sleep and other medically-related policies" require the approval of the Medical Director and the Director of the Substance Use Disorder service); ¶¶ 10–11 (describing Letty Owings' safe sleep policies and education); *see also e.g.*, Velez, M. & Jansson, L.M., *The Opioid dependent mother and newborn dyad: Nonpharmacologic care*, J. Addict Med. 2008 September 1; 2(3): 113–120, https://pubmed.ncbi.nlm.nih.gov/19727440/.

The United States provides minimal explanation for its assertions that (1) plaintiffs' claim is one for "premises liability," and therefore (2) it falls outside the absolute immunity § 233

provides for "any . . . civil action or proceeding" arising from the performance of medical or related functions. On the former point, its logic is circular: "Plaintiffs' complaint alleges general premises liability breaches . . . . The gravamen of Plaintiffs' complaint, therefore, is the breach of a general duty imposed on premises owners." U.S. Br. at 11. In support of the latter, the United States reaches beyond plain text to scattered references in legislative history to the high cost of private medical malpractice coverage as motivating the FSHCAA's expansion of immunity to health centers.

Nothing in the statutory text suggests that the law cares for the distinction the United States attempts to draw. "Whether or not legislative history is ever relevant, it need not be consulted when, as here, the statutory text is unambiguous." *United States v. Woods*, 571 U.S. 31, 46 n.5 (2013). No reading between the lines—even if doing so were permissible—can arrive at the conclusion that § 233 asks a court tasked with determining immunity to not only look to state law to ascertain the reach of an HHS deeming determination but to also, having oriented itself within that particular body of law, analyze particular elements of a plaintiff's claim before making its *threshold* immunity determination.

Put simply: the acts and omissions alleged constitute the performance—or failure to perform—medical or related functions at the heart of Letty Owings' federal grant activities. In this straightforward case, nothing more is required for immunity to apply.

/ / /

/ / /

/ / /

/ / /

/ / /

## CONCLUSION

For the foregoing reasons the Court should deny Section I of the United States motion to dismiss.

Dated: July 25, 2022

Submitted by:

/s/ *Lindsey H. Hughes*

Lindsey H. Hughes
lhughes@keatingjones.com
Keating Jones Hughes, P.C.
200 SW Market Street, Suite 900
Portland, OR 97201-5737
(t) 503-222-9955
(f) 503-796-0699

Matthew S. Freedus, DC Bar # 475887
mfreedus@ftlf.com
Rosie Dawn Griffin, DC Bar # 1035462
rgriffin@ftlf.com
1129 20th Street, NW, Suite 400
Washington, DC 20036
(t) 202-466-8960
(f) 202-293-8103

*Attorneys for Defendants Central City Concern and Letty Owings Center*