**NATALIE K. WIGHT, OSB #035576**
United States Attorney
District of Oregon
**MICHAEL J. JETER, OSB #165413**
Assistant United States Attorney
michael.jeter@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204-2936
Phone: (503) 727-1000
         Attorneys for the United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **NICOLE MORETTI, and WENDY NOVIS, as Personal Representative of the Estate of SAYLOR MORETTI, deceased** | Case No.: 3:21-cv-01525-SI |
| Plaintiffs, | **UNITED STATES' REPLY IN SUPPORT OF MOTION TO DISMISS** |
| **v.** | |
| **LETTY OWINGS CENTER: CENTRAL CITY CONCERN, and/or the UNITED STATES acting through the DEPARTMENT OF HEALTH AND HUMAN SERVICES,** | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION .............................................................................................1

BACKGROUND ................................................................................................2

I.    Responses to This Facial Attack on Jurisdiction Impermissibly Rely on
Material Outside the Pleadings ...............................................................2

II.    Factual Background.....................................................................................3

    A. Clinic Defendants' Application for Federal Grant Funding.....................3

    B. Clinic Defendants' Factual Representations to the United States
    in Support of Their Request for FSHCAA Coverage ...............................7

ARGUMENT ................................................................................................... 14

I.    The United States is Not the Proper Defendant.................................... 14

    A. Saylor Moretti is Not a Patient of LOC ................................................. 14

    B. The Estate's Wrongful Death Claim Does Not Arise Out of Medical
    Malpractice .............................................................................................. 19

II.    FSHCAA Coverage is Limited to Medical Malpractice ......................... 22

III.    The Discretionary Function Exception Bars Plaintiffs' Claim.............. 23

    A. The Discretionary Function Exception Operates on
    Federal Law, and Plaintiffs' Reliance on Clinic
    Defendants' Internal Policies is Misplaced ........................................... 24

    B. The Alleged Failure to Implement an Existing Safety Policy Is Baseless
    and Misconstrues Precedent .................................................................. 26

    C. The Alleged Failures to Train and Supervise Are Protected by the
    Discretionary Function Exception ......................................................... 28

IV.     Nicole Moretti Failed to Exhaust Her Administrative Remedies ......... 30

V.      Nicole Moretti Lacks Capacity Under Oregon Law to Bring a Wrongful
        Death Claim Because She is Not the Representative of Saylor's
        Moretti's Estate ......................................................................................... 34

        CONCLUSION ............................................................................................. 36

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Andrade-Tafolla v. United States*, No. 3:20-cv-01361-IM,
2021 WL 1740242 (D. Or. May 3, 2021) ......................................... 2

*Avery v. United States*, 680 F.2d 608 (9th Cir. 1982) ..................................... 32

*Berkovitz v. United States*, 486 U.S. 531 ......................................... 26

*Cadwalder v. United States*, 45 F.3d 2971 (9th Cir. 1995 .................. 31, 32, 33

*Chadd v. United States*, 794 F.3d 1104 (9th Cir. 2015) ........................... 24, 27

*Dahlton v. Kyser*, 370 Or. 34 (2022) ....................................... 34, 35, 36

*Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009) ......................................... 25, 29

*Estate of Burkhart v. United States*, 2008 WL 4067429
(N.D. Cal. Aug. 26, 2008) ................................................. 33

*Goodman v. United States,* 298 F.3d 1048 (9th Cir. 2002) ................................. 33

*Gonzalez v. United States*, 814 F.3d 1022 (9th Cir. 2015) ............................... 26

*Kelly v. United States*, 241 F.3d 755 (9th Cir. 2005) ...................................... 30

*Kornberg v. United States*, 798 F. App'x 1019 (9th Cir. 2020) .................. 28, 30

*Marlys Bear Med. v. U.S. ex rel. Sec'y of Dep't of Interior*,
241 F.3d 1208 (9th Cir. 2001) ........................................................ 27

*Matthews v. United States*, 805 F. Supp. 712 (E.D. Wis. 1992) ....................... 7

*McNeil v. United States*, 508 U.S. 106 (1993) ..................................... 31, 32, 33

*Michigan v. Bay Mills Indian Community*, 572 U.S. 782 (2014) ................... 16

*Miller v. United States*, 992 F.3d 878 (9th Cir. 2021) ........ 23, 24, 25, 26, 28, 29

*Nurse v. United States*, 226 F.3d 996 (9th Cir. 2000) ...................................... 28

*Prescott v. United States*, 973 F.2d 696 (9th Cir. 1992) ................................. 25

*Safe Air for Everyone v. Meyer*, 373 F.3d 1035 (9th Cir. 2004) ........................ 2

*Shahim v. United States*, No. 221CV02401ODWAGR,
    2022 WL 1644440 (C.D. Cal. May 24, 2022) ................................ 30

*Shipek v. United States*, 752 F.2d 1352 (9th Cir. 1985) ................................. 32

*Tyler-Bennett v. United States*, No. 3:16-cv-2300, 2018 WL 3150676
    (D. Or. June 27, 2018) ................................ 30

*United States v. Gaubert*, 499 U.S. 315 (1991) ........................................ 24, 29

*United States v. Varig Airlines*, 467 U.S. 797 (1984) ...................................... 29

*Valadez-Lopez v. Chertoff*, 656 F.3d 851 (9th Cir. 2011) ................................ 31

*Vickers v. United States*, 228 F.3d 944 (9th Cir. 2000) .............................. 28, 29

*Warren v. United States Dept. of Interior Bureau of Land Mgmt.*,
    724 F.2d 776 (9th Cir. 1984) ........................................ 32

*Whisnant v. United States*, 400 F.3d 1177 (9th Cir. 2005) ......................... 2, 27

*Wolfe v. Strankman*, 392 F.3d 358 (9th Cir. 2004) .......................................... 3

## FEDERAL STATUTES

28 U.S.C. § 1346(b) .......................................................................... 4

28 U.S.C. § 2401(b) .................................................................... 31, 33

28 U.S.C. § 2672 ........................................................................... 4

28 U.S.C. § 2675(a) .......................................................... 2, 31, 32, 33

28 U.S.C. § 2680(a) .......................................................... 2, 31, 32, 33

42 U.S.C. § 233 .................................................................. 1, 15, 25

42 U.S.C. § 233(a) ......................................................... 4, 5, 16

42 U.S.C. § 233(b) ................................................................... 7

42 U.S.C. § 233 (c) .................................................................. 7

42 U.S.C. § 233(g) ......................................................... 4, 5, 16

42 U.S.C. § 233(g)(1)(A) ........................................................ 4

42 U.S.C. § 233(g)(1)(B)-(c) .................................... 4, 12, 15, 16

42 U.S.C. § 233(g)(1)(C) ...................................................... 17

42 U.S.C. § 233(g)(1)(D) ...................................................... 16

42 U.S.C. § 254b ............................................................. 3, 25

42 U.S.C. § 290bb-11 .................................................... 9, 20, 21

42 U.S.C. § 1396d(1)(2)(B) ................................................... 4

## FEDERAL REGULATIONS

28 C.F.R. § 15.4(b) .................................................................. 7

42 C.F.R. § 6.6 ............................................................. 7, 15, 17

42 C.F.R. § 6.6(d) ........................................................... 4, 14

42 C.F.R. § 457.402(aa) .......................................................... 9

Defendant United States submits this Reply in support of its Motion to Dismiss.

## INTRODUCTION

The Court should dismiss the United States from this action because the United States is not the proper defendant and the Court lacks subject matter jurisdiction over Plaintiffs' claims. First, Clinic Defendants' grant application expressly states that they do not provide general primary medical care services to children. In other words, providing medical services to children is not a grant supported activity covered by the Federally Supported Health Centers Assistance Act ("FSHCAA"), 42 U.S.C. § 233.

Plaintiffs' claims do not meet FHSCAA's requirements that the death result from the performance of medical, surgical, dental, or related functions on a patient. The text, context, and legislative history are in accord that FSHCAA encompasses only medical malpractice claims. Clinic Defendants are "deemed" to be PHS employees only for purposes of medical, surgical, dental, or related functions provided to patients, and then only for services that are within the scope of Clinic Defendants' project grant. That requirement is lacking here. FSHCAA does not cover premises liability claims resulting from alleged duties breached to invitees.

 The documents Clinic Defendants submitted to the United States show: (1) children are referred to outside organizations for their medical care for which Clinic Defendants do not pay; (2) Saylor Moretti was not receiving substance use disorder ("SUD") treatment, only Nicole Moretti was; (3) Clinic Defendants disclaimed

responsibility for patients' children at LOC at all times other than when the children were at the onsite daycare facility; (4) the two visits with an LOC on-site nurse were isolated and completely unrelated to the underlying incident; and (5) no licensed physicians or licensed or certified health care providers were involved in the overnight monitoring of LOC residents. Based on the foregoing, the United States properly moved to dismiss claims asserted against it under the FTCA and refused to defend or move for dismissal of the identical claims asserted against Clinic Defendants.

Regardless, Plaintiffs' claims are barred by the Federal Tort Claims Act's ("FTCA") discretionary function exception, and Nicole Moretti failed to exhaust her administrative remedies. *See* 28 U.S.C. §§ 2675(a), 2680(a). Accordingly, even if the United States was the proper defendant, Plaintiffs' claims should be dismissed with prejudice for lack of subject matter jurisdiction.

## BACKGROUND

### I.     Responses to This Facial Attack on Jurisdiction Impermissibly Rely on Material Outside the Pleadings

The Government's motion makes a facial attack under Rule 12(b)(1) "based on the assertion that the allegations in the complaint are insufficient to invoke federal jurisdiction." *Andrade-Tafolla v. United States*, No. 3:20-cv-01361-IM, 2021 WL 1740242, at *2 (D. Or. May 3, 2021) (citing *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)). Where a Rule 12(b)(1) facial challenge is asserted, courts "take the allegations in the plaintiff's complaint as true." *Whisnant v. United*

*States*, 400 F.3d 1177, 1179 (9th Cir. 2005) (citing *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004)). Here, because the Government asserts that the allegations are "insufficient on their face to establish subject matter jurisdiction," the existence of jurisdiction "does not depend on resolution of a factual dispute, but rather on the allegations in" the Complaint. *Wolfe*, 392 F.3d at 362. Accordingly, the other parties' arguments regarding factual attacks and fact discovery to resolve this Motion are irrelevant.

Plaintiffs' and Clinic Defendants' declarations and exhibits should be stricken. Particularly, Clinic Defendants submitted approximately 400 pages of documents to support their response that are identical to the documents they submitted in support of their own motion to substitute. *Cf.* Clinic Defs.' Resp., ECF No. 33, *with* Clinic Defs.' Mot. to Substitute, ECF No. 32. It is a waste judicial resources to consider Clinic Defendants' needlessly cumulative documents. Clinic Defendants improperly seek a second bite at the apple by injecting redundant facts into their response to this facial attack on jurisdiction.

Out of an abundance of caution, the United States presents the following factual background in rebuttal. Regardless, the United States can demonstrate—both facially and factually—that Plaintiffs' claims against it should be dismissed.

## II.     Factual Background

### A. *Clinic Defendants' Application for Federal Grant Funding*

Under Section 330 of the Public Health Service Act, 42 U.S.C. § 254b, the U.S. Health Resources and Services Administration ("HRSA"), may grant health

center federal funds through the Health Center Program. Here, for calendar year 2019, Clinic Defendants applied for and received federal funding from the Health Care for Homeless Program. Declaration of Sean Flaim ("Flaim Decl.") ¶ 3, Ex. A, ECF No. 42. Additionally, Clinic Defendants are a Federally Qualified Health Center ("FQHC") under 42 U.S.C. § 1396d(1)(2)(B), as certified by the U.S. Centers for Medicare and Medicaid. *Id.* at ¶ 4. An FQHC qualifies for specific reimbursements under Medicare and Medicaid for certain medical services provided by the entity. *Id.*

Under FSHCAA, a Health Center Program award recipient may apply for and be deemed by the Secretary of HHS to be an employee of the Public Health Service ("PHS"). 42 U.S.C. § 233(g)(1)(A). Upon approval of a "deeming" application, the "deemed" entity and its employees are eligible for medical malpractice coverage from the United States under the FTCA. 42 U.S.C. §§ 233(a), (g); 28 U.S.C. §§ 1346(b), 2672. The "deeming," *i.e.*, the legal fiction of treating the entity or its employees as a PHS employee, is limited in several ways. It is restricted to services provided to "patients" of the entity and, in limited approved circumstances, to individuals who are not patients. 42 U.S.C. § 233(g)(1)(B)–(C). Moreover, the "deemed" status, and the eligibility for FTCA malpractice protections, is cabined to grant-supported services, also referred to as services within the scope of the grant project. 42 C.F.R. § 6.6(d); HRSA PIN 2008-1, p. 3. Finally, FSHCAA limits claims cognizable against the United States to claims for "damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or

related functions" by a PHS employee while acting within the scope of their employment. 42 U.S.C. § 233(a).

In 2018, Clinic Defendants submitted a deeming application to HRSA for coverage for calendar year 2019. Flaim Decl. ¶ 6, Ex. B. HRSA approved the application for Clinic Defendants for 2019. *Id.* ¶ 7, Ex. C. The deeming notice confirms that it provides "medical malpractice coverage" for Central City Concern ("CCC") and its covered individuals. *Id.* Ex. C, at 2. The deeming notice also notes that Clinic Defendants were subject to the terms and conditions incorporated by the program regulations set forth in 42 C.F.R. Part 6 and the FTCA Health Center Policy Manual ("HC Policy Manual."). *Id.* ¶ 8, Ex. D.  The HC Policy Manual likewise specifies that the program established under 42 C.F.R. Part 6, referred to as the Health Center FTCA Medical Malpractice Program, is intended to increase availability of funds to health centers to provide primary care services by reducing or eliminating the centers' malpractice insurance premiums. *Id.* Ex. D, 4, 6.

The HC Manual further explains the limitations of FSHCAA medical malpractice coverage. In relevant part, covered actions must be within the scope of the project (i.e. grant-supported activities) and occur during the provision of services to the covered entity's patients. *Id.* at 7. HRSA's Scope of Project Policy defines what constitutes the scope of project for health centers under the PHS Act and for FQHC reimbursements. HRSA PIN 2008-01, p. 2. A health center's scope of project specifically defines the services for which grant funds have been approved and determines the scope of medical malpractice coverage under the FTCA. *Id.* at p. 3.

Health centers "may carry out other activities (i.e., other lines of business) that are not part of the scope of project and, thus, are not subject to section 330 requirements and expectations." *Id.* For example, a health center may run a daycare that that is not within the scope of the project and does not use section 330 funds, and, therefore would not be eligible for FTCA coverage or Medicaid or Medicare reimbursements. *Id.*

The project scope is limited to the performance of medical, surgical, dental, or related functions within the scope approved for the federal grant project (as demonstrated by forms 5-A, 5-B, and 5-C submitted by the health center). Flaim Decl. Ex. D, at 7–8. Further, to meet FTCA requirements of providing services to health center patients, a patient-provider relationship must be established, and the acts or omissions giving rise to a particular claim must have occurred during the provision of those services to the patient. *Id.* at 8, 21.

Moreover, the "FTCA provides protection only for personal injury, including death, resulting from the performance of medical, surgical, dental, ore related functions, which constitute medical malpractice for purposes of [the HC Manual]." *Id.* at 18. "Consequently, even with FTCA coverage, covered entities will continue to need other types of insurance, such as non-medical/dental professional liability coverage, general liability coverage, director's and officer's liability coverage, automobile and collision coverage, fire coverage, and theft coverage." *Id.*

Once an entity is deemed eligible for medical malpractice coverage, if a claimant brings claims against the covered entity, that entity is required to supply

HHS with documentation demonstrating that the acts or omissions giving rise to the particular claim meet the requirements for FSHCAA coverage. *Id.* at 21; 42 C.F.R. § 6.6. It is ultimately up to the Attorney General and his designees whether the United States should intervene to cause its own substitution for an entity or individual named as a defendant. 42 U.S.C. §§ 233(b), (c); 28 C.F.R. § 15.4(b). Where, as here, the United States and an entity are both named as defendants, the United States' choices are straightforward. It can move for its own dismissal if the claims are not cognizable against it. Alternatively, if the claims are exclusively cognizable against the United States, it moves for dismissal of the claims against the entity-defendant, as substitution would serve no purpose given the pendency of the claims against the United States. *Cf. Matthews v. United States*, 805 F. Supp. 712, 715 (E.D. Wis. 1992).

**B. Clinic Defendants' Factual Representations to the United States in Support of Their Request for FSHCAA Coverage**

Here, Wendy Novins as the personal representative of Saylor Moretti's estate submitted a SF-95 administrative tort claim notice to HHS, asserting that Clinic Defendants were responsible for Saylor Moretti's death. Flaim Decl. ¶¶ 10–12, Ex. E. The claim alleged that while Nicole Moretti was receiving treatment at LOC, Saylor Moretti's death was caused by "co-sleeping or being crushed by the weight of his mother due to staff negligence." Flaim Decl. Ex. E. The claim's listed bases included alleged failures to train and supervise staff, have a co-sleeping policy, provide a crib, and monitor to prevent co-sleeping. *Id.*

Clinic Defendants then provided documents to HHS that the Attorney General considered to determine whether the alleged acts and omissions fell within the scope of the entity's deemed employment. Flaim Decl. ¶ 12, Ex. D at 21–22 (listing the documents health centers are required to submit to HHS)[1]. First, the Attorney General considered Clinic Defendants' grant application. Flaim Decl. Ex. A. LOC is a delivery site for CCC on grant application Form 5-B. *Id.* at 190–91. Notably, CCC is a FQHC that qualifies for specific reimbursements under Medicare and Medicaid but the grant application states that LOC does not bill under that system. *Id.* Clinic Defendants identify four types of services they provide: "medical, behavioral health, enabling, and pharmacy services." *Id.* at 57. Behavioral health includes substance use disorder ("SUD") treatment. *Id.* LOC is listed as providing *only* SUD and enabling services. *Id.*

The grant application stated that Clinic Defendants do not provide "General Primary Care (for children)" nor "Well Child Services." *Id.* at 51. Instead, the application states that CCC "refers out and does not provide in-house, but in

---

[1] Required documents include, in relevant part:
  - the complaint
  - the entity's deeming letters and notices of grant awards
  - copies of the grant application and forms 5-A, 5-B, and 5C setting forth the scope of the project including delivery sites and services
  - copies of a statement from the entity identifying which providers are involved
  - evidence that the named provider was a licensed physician or licensed or certified health care provider
  - a declaration verifying the employment of each individual involved in the alleged incident, signed by each provider whose care is at issue
  - Copies of any professional liability or gap insurance policy that provides coverage to the health center and the named provider.

arrangement with other providers and organizations serving the healthcare needs of the homeless. Of required services, CCC will refer out for: . . . well child services, general primary care for children, OB services, and dental." *Id.* at 46, 182. General primary medical care for children was referred to Multnomah County and well child services were referred to Oregon Health & Sciences University and Multnomah County. *Id.* at 51.

Once more, Clinic Defendants represented to HHS that LOC provides two forms of services: SUD and enabling. Regarding SUD, CCC states that it provides: (1) individual assessment and counseling, including both SUD only and integrated SUD and mental health for patients with dual diagnoses; (2) group therapy; (3) acupuncture; (4) medication-assisted treatment; and (5) medical management for withdrawal. *Id.* at 55. LOC's SUD service is a family-focused residential treatment program defined, in relevant part, as a program "primarily for substance use disorder treatment for pregnant and postpartum women and parents and guardians that allows children to reside with such women or their parents or guardians during treatment to the extent appropriate and applicable." 42 U.S.C. § 290bb-11. Enabling services include such things as transportation, translation, and outreach services. 42 C.F.R. § 457.402(aa).

The Attorney General also examined other documents produced by Clinic Defendants beyond the grant application. Clinic Defendants provided a document entitled "Welcome to Letting Owings Center." Flaim Decl. ¶ 13, Ex. F. The packet states that LOC's patients are assigned a clinic team and counselor and receive a

mixture of group and individual therapy, including coping with trauma, conflict resolution, relapse prevention and self-help meetings, as well as more general education in life skills including resolving adverse rental history and financial literacy. *Id.* at 2–3. While patients are at the LOC participating in these activities, their children are watched either by the on-site nursery (for children 12 months and under) or by off-site childcare. *Id.* The Attorney General also reviewed a brochure entitled "Letty Owings Center" that described LOC's services to include medical referrals for children and women. Flaim Decl. ¶ 14, Ex. G. For children, a registered nurse was on site part-time during the day, and the center provides childcare planning, childcare while mothers participate in groups and classes, parenting assistance, and referrals to mental health agencies when appropriate. *Id.*

Clinic Defendants also submitted documents filled out and signed by Nicole Moretti when she arrived at the LOC, including a "Child Care Contract" and "Commitment to a Pro-Social Community." Flaim Decl. ¶ 15, Ex. H. Clinic Defendants expressly disclaim responsibility for the health and safety of their patients' children outside the onsite daycare. *Id.*

Clinic Defendants' Senior Director of SUD Services, Amanda Risser, M.D., provided a narrative describing the incident at issue in this litigation. Flaim. Decl. ¶ 16, Ex. I. She wrote that Nicole Moretti's treatment plan for opioid and stimulant use disorders included drug and alcohol treatment implemented by clinical and milieu staff at LOC, including treatment assistants ("TAs"), case managers, parent trainers, certified alcohol and drug counselors, nursing staff, and Dr. Risser as the

LOC medical director. *Id.* Regarding medical care to children, the part-time on-site nurse is available for triage, but otherwise medical care for children is provided by outside medical providers. *Id.* Dr. Risser wrote that "parents are responsible for the safety of their children" outside the daycare facility and "parents are to be in arms reach and directly supervising children at all times." *Id.* Additionally, Dr. Risser wrote that every individual is provided with a safe sleep environment, and residents are trained by clinical staff around safer sleep for infants. *Id.* At the time Nicole Moretti was at LOC, their policy included education about safer sleep; regular conversations about safer sleep with a nurse and parent trainer; three times nightly bed checks for unsafe sleep by TAs; and facilitation of parent correction of unsafe sleep if unsafe sleep is occurring. *Id.*

Regarding the TAs who are on site at LOC overnight and conduct bed checks, HHS was provided with a job description of the position "Female Treatment Assistant I – Letty Owings Center." Flaim Decl. ¶ 17, Ex. J. TAs are not licensed physicians nor are they licensed or certified health care providers. *Id.* TAs do not provide medical treatment to LOC patients or their children. *Id.*

LOC records show that Saylor Moretti was seen twice by the on-site nurse on September 17 and 30, 2019, for initial intake assessment and triage. Flaim Decl. ¶ 18, Ex. K. The first visit was an initial assessment, and the only medical concern identified was diaper rash. *Id.* The triage visit concerned congestion and resulted in the nurse showing Nicole Moretti how to suction the infant's nose. *Id.*

Regarding the incident underlying this litigation, Clinic Defendants provided

an incident report. Flaim Decl. ¶ 20, Ex. M. The report indicates that at approximately 9:15 a.m., during room checks, TA Allie Smith knocked on Nicole Moretti's door. When she answered the door, Nicole Moretti appeared to have just woken up. *Id.* Ms. Smith was unable to see Saylor Moretti. *Id.* After searching, Ms. Smith found Saylor Moretti on Nicole Moretti's bed under a blanket, "purple and unresponsive." *Id.* Ms. Smith initiated CPR and called Program Director Todd Jeter who, in turn, immediately called 911. *Id.*

Regarding this incident, the Attorney General first assessed whether Saylor Moretti was a patient of Clinic Defendants under 42 U.S.C. § 233(g)(1)(B). The Attorney General concluded that Saylor Moretti was not a patient for the following reasons:

- CCC's grant application states that it does not provide general primary care to children or well child services. Those services are referred to outside organizations for which CCC does not pay.

- LOC is a residential SUD treatment facility. While Nicole Moretti was engaged in SUD treatment, Saylor Moretti was not receiving such care from CCC and LOC. Rather, his presence was solely incident to his mother's residence at LOC.

- According to its description of SUD treatment, only certain services provided in such treatment are medical in nature. For example, group and individual counseling, psychiatric care, and medical management of withdrawal are all medical in nature. The teaching of basic parenting skills, financial skills, etc., are not. Likewise, none of these services, medical or otherwise, were directed to Saylor Moretti. Rather, they were all directed to Nicole Moretti.

- LOC mainly provides childcare to its resident's children so

that its residents can engage in their SUD treatment. Otherwise, LOC provides, at most, incidental visits with nurses for children. All substantive medical care for children is provided by and coordinated with outside entities.

- The two visits with the LOC nurse were for isolated care, and the alleged negligence with respect to the child is completely unrelated to those visits. Further, providing general primary medical care for children was not a grant-supported activity eligible for FTCA coverage.

Independent of this determination, the Attorney General also concluded that Saylor Moretti's death did not result "from the performance of medical, surgical, dental, or related functions" by a deemed provider acting within the scope of their employment for the following reasons:

- The phrase "related functions" is inextricably tied to medical, surgical, or dental" and the alleged negligence did not result from medical treatment.

- Clinic Defendants' grant application specifically disclaims that it provides medical treatment to children. Rather, those services are referred to outside providers and Clinic Defendants do not pay for such services.

- The negligence allegations are non-medical in nature and do not involve medical treatment performed by a licensed medical provider.

- Clinic Defendants maintain that patients are responsible for the care of their children when not in LOC provided childcare. In contrast to an infant's presence in a hospital where the hospital assumes the duty of care for both the mother and child.

- At night when the incident occurred, LOC is monitored only by FTAs who have no medical certification or license.

The Attorney General, therefore, declined to certify that Clinic Defendants

were entitled to medical malpractice coverage under FSHCAA.

ARGUEMENT

## I. The United States is Not the Proper Defendant

### a. *Saylor Moretti was Not a Patient of LOC*

#### i. *General Primary Medical Care for Children is Not a Grant Supported Activity*

Clinic Defendants' grant application *specifically states that they do not provide general primary medical care services to children.* Flaim Decl. Ex. A, 51, 58. Meaning, Clinic Defendants do not use federal funds to provide medical services to children and such services are not grant supported activities. *See* 42 C.F.R. § 6.6(d) ("Only acts and omissions related to grant-supported activity of entities are covered."). Medical services to children are exclusively referred to outside medical providers and Clinic Defendants do not pay for those services. Flaim Decl. Ex. A at 51, 58. If a health center establishes a formal referral arrangement with an outside organization—as Clinic Defendants have done here for medical care for children—"then the SERVICE IS NOT included in the grantee's scope of project." HRSA PIN 2008-1, at p. 11 (emphasis in original). Because general primary care for children is not grant supported activities, if Clinic Defendants did elect to provide such services to children at LOC, then those services would not be covered by FSHCAA. Such services would be considered an "other line" of business outside the scope of the project. *Id.*

#### ii. *FSHCAA Deeming Applies to Covered Services Provided to Patients of the Entity*

The FSHCAA, which was engrafted onto the Public Health Service Act, "deems" certain entities and individuals to be PHS employees for purposes of 42 U.S.C. § 233. To "deem" is to create a legal fiction—to treat something as if it were something else for some statutory purpose. Black's Law Dict. (11th ed. 2019). Here, the statutory fiction is that non-federal actors are treated "as if" they are PHS employees for a limited purpose—one defined by the federal law creating the fiction.

Congress did not leave who can be deemed a PHS employee to whim; rather, it plainly provided that the "deeming" applies "with respect to services" provided to "patients of the entity." 42 U.S.C. § 233(g)(1)(B). As for "services provided to individuals who are not patients of the entity," deeming can only occur if the Secretary of HHS so determines upon reviewing a "deeming application." *Id.* at § 233(g)(1)(C).[2] There is nothing ambiguous about the plain language Congress used to cabin the scope of the legal fiction it created.

---

[2] Here, child services, medical or otherwise, were not grant-supported activities, and Clinic Defendants did not attempt either by requesting a change of scope to encompass them or to seek a "particularized" determination that such services be covered under the criteria applicable to non-patients. Sections 233(g)(1)(B)–(C) were added in 1995 to codify "provisions of the May 8, 1995, final regulations which state that malpractice coverage will be provided under the FTCA for acts and omissions related to the grant-supported activity of the health center and describe the conditions under which health center practitioners are covered for services to individuals who are not registered patients of the health center." H.R. Rep. No. 104-398, 104th Cong., 1st Sess., p. 7 (Dec. 12, 1995). This codification was designed to "clarify the application of FTCA malpractice coverage to health services provided in certain situations when health care clinicians are treating patients who are not registered with the health center." *Id.* at 5; *see also* 42 C.F.R. § 6.6.

Clinic Defendants do not dispute what the statute says, despite accusing the United States of failing to read the statute in a "clear-eyed" fashion. Instead, Clinic Defendants argue that this plain reading would "defeat the statute's mandated equivalency." *See* Clinic Defs.' Resp. to Mot. to Dismiss 13–14. This is not a basis to judicially revise or ignore otherwise plain language. Moreover, Clinic Defendants' premise is mistaken.[3] Section 233(g)(1)(A), to be sure, provides that, if an entity or individual is "deemed to be a Public Health Service employee," then the remedy against the United States under the FTCA is exclusive to the same extent as it made exclusive under 42 U.S.C. § 233(a). But Clinic Defendants ignore that the "deeming" occurs only upon "approval by the Secretary of an application under subparagraph (D)." And subparagraph (D) states that the application shall meet "the requirements of subparagraphs (B) and (C)." 42 U.S.C. § 233(g)(1)(D). Sections 233(g)(1)(B)–(C) thus set the scope and limits of a "deeming" if, and at the time, the Secretary approves the required application. And, there is no "mandated equivalency" under the FSHCAA—actual PHS employees do not have to submit applications in the form and manner the Secretary prescribes, nor do they require a statutory legal fiction to make 42 U.S.C. § 233(a) applicable.

Clinic Defendants are wrong that Sections 233(g)(1)(B)–(C) provide only a "mechanism" for confirming what is and is not considered within the scope of a

---

[3] *See Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 794 (2014) (courts do not revise legislation just because text as written creates "an apparent anomaly," or because Congress "must have intended" something broader).

grant. Sections 233(g)(1)(B)–(C) were enacted to set the scope of malpractice

protections afforded to qualifying grant recipients who apply to be "deemed" PHS

employees—a direct response to the uncertainty many entities had about the scope

of the protections afforded under the original 1992 FSHCAA. *See* H.R. Rep. No. 104-

398, p.6 (noting that the "lengthy period of uncertainty regarding the law's scope

made it necessary for many health centers to continue their private malpractice

coverage.").

Consequently, if Saylor Moretti was not a patient of Clinic Defendants—and

he was not—then neither Clinic Defendants nor their qualifying personnel were

"deemed" to be PHS employees for purposes of any service provided to him. Nor was

Saylor Moretti certified through an individualized determination request to HHS to

be a covered non-patient. 42 U.S.C. § 233(g)(1)(C); 42 C.F.R. § 6.6. In these

circumstances, Saylor was an invitee on the premises. As such, the duties owed

toward Saylor were duties owed by any similarly-situated premises owner to

invitees, not special professional duties a physician or medical provider owed to

patients. Premises liability claims are not within the scope of the FSHCAA's limited

malpractice protections.

### *iii.   Saylor Moretti Was Not Clinic Defendants' Patient*

Plaintiffs and Clinic Defendants latch onto two instances where LOC's on-site

nurse initially assessed and triaged Saylor Moretti. *See* Mot. to Substitute 10; Clinic

Defs.' Resp. to Mot to Dismiss 17; Pls.' Resp. to Mot. to Dismiss 3–4. They make

strained arguments that those two instances transformed Saylor Moretti into a

patient under 24/7 medical care of LOC covered by FSHCAA. Regardless, general primary care is not a grant supported activity eligible for FSHCAA coverage. When Clinic Defendants requested a FSHCAA coverage regarding the incident, they provided no description of the registered nurse position, nor did any narrative or other document they submitted claim that Saylor Moretti's death resulted from medical services provided by the on-site nurse. The on-site nurse, Alie Oyster, RN, saw Saylor Moretti on September 19 and 30, 2019, once for an initial intake assessment where she advised Nicole Moretti about diaper rash, and a second time to address congestion. Flaim Decl. at ¶ 18, Ex. K. That was the extent of Saylor Moretti's interactions with Ms. Oyster.

Neither Plaintiffs nor Clinic Defendants articulate how Saylor Moretti's death resulted from a medical function performed by that nurse. Simply put, Saylor Moretti's death was wholly unrelated to the two individual instances where he met with Ms. Oyster. There is no factual, legal, or logical connection between the nursing visits and the co-sleeping incident underlying Plaintiffs' claim.

Not only was LOC not providing covered medical care to Saylor Moretti, LOC specifically disclaimed responsibility for his health and safety in general. Flaim Decl. ¶ 15, Ex. H. Clinic Defendants' position that Saylor Moretti was a patient under their 24/7 medical care is a post-hoc rationalization contradicted by their own documents. This is supported by the narrative submitted to HHS by Clinic Defendants' Senior Director of SUD Services, Amanda Risser, MD. In requesting FSHCAA coverage, Dr. Risser wrote:

> At [LOC] children's parents are responsible for the safety
> of their children with staff's guidance and support. Letty
> Owings Center does not directly supervise children outside
> of the on-site licensed childcare facility unless there is an
> emergency while care is being arranged for the time that
> the parent may not be able to care for the child. Otherwise,
> parents are to be in arms reach and directly supervising
> children at all times or working with a peer to briefly watch
> their child while on a short walk.

Flaim Decl. ¶ 16, Ex. I. Despite the facts that the grant application disclaims providing medical services to children, no medical services were provided to Saylor Moretti in connection with the incident, and Clinic Defendants disclaim responsibility for the health and safety of their residents' children. They now want to shunt responsibility for ordinary negligence from their general liability insurer onto the United States. *See* Flaim Decl. ¶ 21, Ex. N, at 5, 23 (Clinic Defendants' gap coverage submitted to HHS includes coverage for "commercial general liability" for any claim for "general liability injury arising out of operations of the named insurer").

### b. *The Estate's Wrongful Death Claim Does Not Arise Out of Medical Malpractice*

Aside from the irrelevant nurse visits discussed above, Clinic Defendants argue that Nicole Moretti's SUD treatment in a residential setting rendered Saylor Moretti a patient whose death resulted from the performance of a medical or related function. Mot. to Substitute 18–22. Their position is that because the SUD services were provided in a residential treatment setting, that the residential treatment itself is a medical function involving various components. This argument, taken to

its logical conclusion, renders everything that happens under LOC's roof a medical or related function covered by FSHCAA. *See* HRSA PIN 2008-01, at p. 3 (explaining that health centers can and do perform activities outside the scope of project, but those activities are ineligible for FTCA coverage). This expansive interpretation of Nicole Moretti's SUD treatment renders FSHCAA's limitations to medical surgical, dental, or related (i.e., similar) services to patients meaningless, contradicts the scope of services provided by LOC in the grant application, nullifies the need for Clinic Defendants to maintain general liability insurance, and absolves residents of all responsibility for their children despite LOC's own documents establishing otherwise.

Saylor Moretti was not receiving SUD services. Nicole Moretti was, but her treatment cannot be imputed to Saylor Moretti for purposes of establishing that his death resulted from medical services provided to a patient under FSHCAA. LOC's SUD services to Nicole included: (1) Individual assessment and counseling, including both SUD only and integrated SUD and mental health for patients with dual diagnoses; (2) Group therapy; (3) Acupuncture; (4) Medication-assisted treatment; and (5) Medical management of withdrawal. Flaim Decl. Ex. A at 55.

More broadly, SUD services, by their definition and nature, are directed at the individual who is experiencing substance use disorder. The family-focused residential treatment program for SUD "for pregnant and postpartum women . . . allows children to reside with such women . . . during treatment to the extent appropriate and applicable." 42 U.S.C. § 290bb-11. Here, Nicole Moretti was

receiving treatment for her methamphetamine and heroin use. Flaim Decl. Ex. K at 2; Declaration of Karl Anuta ("Anuta Decl") Ex. 2 at 4, ECF No. 29. Clinic Defendants' "Substance Abuse Services Conclusion/Transfer Summary" stated that Nicole Moretti was diagnosed with and receiving SUD services for severe amphetamine use disorder. Anuta Decl. Ex. 2 at 4. LOC's description of their own services confirms, that LOC's "services are geared toward the needs of pregnant women and mothers of children under age 6." Anuta Decl. Ex. 4, at 2; *see also* Flaim Decl. Ex. G (LOC's brochure stating that it provides "residential treatment services for *women in residence* at [LOC]"); Flaim Decl. Ex. I (Dr. Risser's declaration stating that "Nicole Moretti entered residential treatment at Letty Owings for opioid use disorder and stimulant use disorder"). While aspects of Nicole Moretti's education by LOC staff included safer sleeping protocols, equipping Nicole Moretti with the knowledge of the risks and need to avoid co-sleeping does not turn Saylor Moretti into a patient receiving SUD services.

Additionally, the long-standing position of HHS and the U.S. Centers for Medicare and Medicaid Services ("CMS") is that not all activities that occur within a residential SUD treatment facility are medical in nature. This is particularly so in a facility that provides Family-Focused Residential Treatment. 42 U.S.C. § 290bb-11. In response to the legislation defining and strengthening such programs, the Administration for Children & Families and CMS issued an informational bulletin discussing how states can deploy their Medicaid funding to support such entities. Flaim Decl. ¶ 22, Ex. O; *see also* HRSA PIN 2008-01, p. 1 (describing the scope of

project for health centers regarding FTCA coverage as well as Medicare & Medicaid reimbursements). As noted in this bulletin, certain services, such as room and board, childcare, education, housekeeping, job training, groceries, non-medical transportation, and legal aid are not Medicaid reimbursable. Flaim Decl. Ex. O, at 7.

In sum, Plaintiffs' claims do not result from the performance services within the scope of LOC's project grant and likewise do not result from the provision of medical, surgical, dental, or related services to a patient of LOC. The scope of the grant specifically does not cover medical services provided to children. LOC's SUD services are limited to Nicole Moretti's treatment for her conditions and do not render Saylor Moretti a patient within the meaning of FSHCAA. LOC specifically disclaims responsibility for the health and safety of their patients' children. No licensed or certified health care provider is involved in overnight monitoring at LOC, and the only onsite staff were unlicensed TAs who do not qualify for medical malpractice coverage. As such, Saylor Moretti's death did not result from the performance of a medical, surgical, dental, or related function, and he was not a patient of LOC. The Court should deny Clinic Defendants' attempt to shirk responsibility for non-professional medical activities onto the United States.

## II.     FSHCAA Coverage is Limited to Medical Malpractice

Clinic Defendants ignore the text, context, and legislative history of FSHCAA as well as decisions from this Court and other courts in this District recognizing that FSHCAA's exclusive purpose is to provide coverage only for medical

malpractice liability. Clinic Defendants' position about the class of claims to which the FSHCAA applies is untenable as a matter of federal statutory interpretation. Their reading the phrase "related function" in a vacuum results in a breathtaking expansion of FSHCAA's coverage, nullifying the Act's sole concern with medical malpractice and transforming the United States into an umbrella insurer for health centers for any conceivable form of liability.

The United States hereby relies on and incorporates the arguments it makes in Part III of its response to Clinic Defendants' Motion to Substitute filed concurrently with this reply. *See* U.S. Resp. to Mot. to Substitute, Part III.

### III.    The Discretionary Function Exception Bars Plaintiffs' Claim

Plaintiffs appears to concede that the discretionary function exception applies to their negligence allegations regarding policymaking, staffing, and resource allocation—failing to offer any rebuttal on those acts. *See* Pl.'s Resp. 10–11. At a minimum, those allegations should be dismissed with prejudice for lack of subject matter jurisdiction. *See* Am. Compl. ¶ 14(b), (c), (d). Further, Plaintiffs identify no federal statute, regulation, or policy that prescribed a particular course of conduct here. Plaintiffs thus concede the first "discretionary act" prong of the analysis. *See Miller v. United States*, 992 F.3d 878, 886 (9th Cir. 2021) (shifting the burden on the plaintiff to identify "a federal statute, regulation, or policy" that removed discretion).

Plaintiffs likewise ignore the legal significance that if no federal law or policy dictated the conduct here, then there is a "strong presumption" that the acts are

susceptible to a policy analysis and therefore satisfy the second "policy judgment" prong. *United States v. Gaubert*, 499 U.S. 315, 324 (1991); *see also Chadd v. United States*, 794 F.3d 1104, 1113 (9th Cir. 2015) (quoting the same). And this presumption holds in this case given the decisions about whether to require health centers like Clinic Defendants to train and supervise their employees to do certain things implicates social, economic, and political considerations.[4]

### A. The Discretionary Function Exception Operates on Federal Law, and Plaintiffs' Reliance on Clinic Defendants' Internal Policies is Misplaced

Clinic Defendants are not federal employees in fact. Their status as federal employees is at most a legal fiction if FSHCAA's requirements are met—which they are not here. Even if Clinic Defendants were considered federal employees, then whether the United States retains its sovereign immunity from liability for its employees' acts is determined, in part, by evaluating whether federal law or policy withdrew the employees' discretion to act.

In the vast majority of FTCA cases, the actors are federal employees in fact, and the courts examine the federal statutes, regulations, and policies relevant to the federal employee's department or agency. Here, however, because Clinic Defendants' purported federal employee status would be created by FSHCAA, the

---

[4] Plaintiffs erroneously argue against the application of Oregon's discretionary immunity statute. The United States' motion did not rely on this statute and Oregon state law is irrelevant to the FTCA's discretionary function exception. *See Miller v. United States,* 992 F.3d 878, 886 n.3 (9th Cir. 2021). Therefore, Plaintiffs' argument regarding Oregon law is misplaced.

analysis evaluates the federal statutes (FSHCAA and the Public Health Service Act) and the implementing regulations and policies that establish the terms and requirements for FSHCAA coverage. *See* 42 U.S.C. § 233; 42 U.S.C. § 254b (the Public Health Service Act); 42 C.F.R. Ch. 1, Subchs. A & D. FSHCAA and its implementation regulations give health centers broad discretion to conduct their operations. To obtain federal grant funding and FSHCAA coverage, health centers must meet certain requirements, including demonstrating that their physicians and licensed and certified health care practitioners are properly credentialed. 42 U.S.C. § 254b, 233; 42 C.F.R. Ch. 1, Subch. D (setting forth grant requirements).

None of the requirements for health centers to receive federal funding and coverage under FSHCAA prescribe a course of conduct related to overnight monitoring of residents at residential substance abuse treatment centers such as the LOC. In other words, the Government did not undertake responsibility for overnight monitoring and federal law gives health centers complete discretion whether and how to do so. Plaintiffs do not even attempt to carry their burden of demonstrating the contrary. *See Doe v. Holy See*, 557 F.3d 1066, 1084 (9th Cir. 2009) ("While the burden of pro[of] . . . ultimately falls on the . . . entity asserting the discretionary function exception, 'a plaintiff must advance a claim that is facially outside the discretionary function exception in order to survive a motion to dismiss.'") (quoting *Prescott v. United States*, 973 F.2d 696, 702 & n.4 (9th Cir. 1992)); *Miller*, 992 F.3d at 886 (holding that because an action would be deemed discretionary, the burden shifted to the plaintiff to identify federal law to the

contrary).

Plaintiffs base their argument on Clinic Defendants' alleged failures to implement an unidentified safety policy. The discretionary function exception operates on federal statute, regulation, and policy, and Plaintiffs' reliance on anything else is irrelevant. *See Berkovitz v. United States*, 486 U.S. 531, 536 (holding that the exception requires evaluating whether a "*federal* statute, regulation, or policy specifically prescribes a course of action for an employee to follow"); *see also Miller v. United States*, 992 F.3d 878, 886 n.3 (9th Cir. 2021) (explaining that federal law, and not state law is relevant to the exception).

### B. The Alleged Failure to Implement an Existing Safety Policy Is Baseless and Misconstrues Precedent

Because Plaintiffs have failed to carry their burden of identifying any federal statute, regulation, or policy, the Clinic Defendants acted with discretion and there is a "strong presumption" that the challenged actions "were grounded in policy considerations." *Gonzalez*, 814 F.3d at 1036. Plaintiffs cannot overcome this presumption with the baseless argument that Clinic Defendants failed to implement an established government safety program. There was no such program in fact, not alleged on the face of the Amended Complaint, nor do Plaintiffs point to any facts to support this argument. Facially or factually the argument fails.

The authority Plaintiffs rely on misses the mark and involve scenarios which are far cries from this case. For example, Plaintiffs' primary case involved a plaintiff who was fatally struck by a falling tree at a private logging operation that was

governed by a contract with the U.S. Bureau of Indian Affairs ("BIA"). *Marlys Bear Med. v. U.S. ex rel. Sec'y of Dep't of Interior*, 241 F.3d 1208, 1211 (9th Cir. 2001). There, the contract required the BIA to inspect the operation and suspend it if it did not comply, in relevant part, with a detailed set of federal statutory and regulatory requirements for proper timber practices. *Id.* at 1215 n.3. The Ninth Circuit reasoned that the discretionary function exception did not apply because of this safety program established by contract and because the BIA had "virtually complete control" over the operation. *Id.* at 1217. Here, by contrast, no such contract exists, and the United States has not undertaken an analogous safety policy or control of Clinic Defendants.

Similarly, *Whisnant v. United States*, is inapposite and involved the negligent operation of a commissary at a naval base over the course of years where meat contaminated by mold caused the plaintiff's illness. 400 F.3d 1177, 1179 (9th Cir. 2005). The Ninth Circuit's decision not to apply the exception was based on the federal employees' failure to follow through on an established course of "governmental conduct" to conduct inspections under federal regulations. *Id.* at 1179–80. The decision also turned on the failure to exercise objective scientific judgment to remove the mold. *Id.* at 1183. Here too, there was no analogous federal safety regulation. *See Chadd v. United States*, 794 F.3d 1104, 1112–13 (9th Cir. 2015) (narrowing the holding of *Whisnant* and recognizing that the exception applies if "even one policy reason why officials may decide not to take a particular course of action to address a safety concern"); U.S. Resp. to Mot. to Substitute Part

II (laying out Congress' policy goal of maximizing federal funds to health centers by focusing on covering only professional medical conduct). Less requirements on grantees means more grant application approvals and, in turn, greater health services provided to communities. The Ninth Circuit in *Chadd* also rejected the argument, similar to the one Plaintiffs make here, that the Government was required to exercise reasonable care, holding that reasonable care does not "go to the question of whether" the officials "had discretion." *Id.* Whether there was "one reasonable course of action" is not relevant under § 2680(a), which protects federal employees' actions even if they "constitute an abuse of policy discretion." *Id.*; *see also Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) ("Under the FTCA . . . negligence in performing discretionary functions is not actionable."). Further, there was no objective professional judgment involved (medical professional or scientific).

### C. The Alleged Failures to Train and Supervise Are Protected by the Discretionary Function Exception

The United States is exempt from liability for the alleged negligent training and supervision claim. It is well established that "[c]laims based on 'negligent and reckless employment, supervision[,] and training' of government employees 'fall squarely within the discretionary function exception.'" *Kornberg v. United States*, 798 F. App'x 1019, 1020 (9th Cir. 2020) (quoting *Nurse v. United States*, 226 F.3d 996, 1001 (9th Cir. 2000) (collecting cases)); *see also Miller v. United States*, 992 F.3d 878, 886 (9th Cir. 2021) ("This court and others have held that decisions

relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield.") (quoting *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000)). "[T]he purpose of the exception is to 'prevent judicial second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (quoting *Varig Airlines*, 467 U.S. at 814).

No federal law or policy dictates whether or how Clinic Defendants should train or supervis their employees regarding overnight monitoring. Further, whether an actual decision was made or that the challenged actions "were actually based on policy considerations" is "not relevant to whether the discretionary function exception applies." *Holy See*, 557 F.3d at 1085; *accord Miller*, 992 F.3d at 888 (holding that what matters is not whether the challenged action "was actually based on policy considerations, but whether the actions taken by the employee 'are susceptible to policy analysis'"). Such training and supervision decisions, by their nature, are susceptible to a policy analysis and therefore protected. *Holy See*, 557 F.3d at 1085 (considering what social, economic, or political policy considerations could have influenced the challenged decisions and concluding that the failure to supervise claim was barred).

> [D]ecisions regarding the training of employees, including training them to respond to threats, "implicate[] competing policy considerations, such as employee and public safety, economic resources (including the number of individuals to be trained, the extent and the cost of training, and the

> agency's resources), impact on the agency's relationship
> with contractors, and the agency's goals and duties."

*Shahim v. United States*, No. 221CV02401ODWAGR, 2022 WL 1644440, at \*4 (C.D.

Cal. May 24, 2022) (quoting *Kelly v. United States*, 241 F.3d 755, 762 (9th Cir.

2005)); *see also Kornberg*, 798 F. App'x at 1020 (affirming dismissal of a claim based

on negligent supervision and management of employee-doctors).

Here too, decisions not to require health centers like Clinic Defendants to

train and supervise their employees regarding overnight monitoring for co-sleeping

are susceptible to policy analysis because they implicate social, economic, and

political considerations. The overriding purpose of FSHCAA is to relieve health

center grantees of the burden of rising malpractice insurance costs to increase the

availability of funds to them to provide services to communities. *See Tyler-Bennett*

*v. United States*, No. 3:16-cv-2300, 2018 WL 3150676, at \*2 (D. Or. June 27, 2018)

(Simon, J.) ("With more available funds, Health Centers can provide more primary

health care services to those in need."). The decisions not to require health center to

comply with detailed safety regulations (including supervision and training

regarding co-sleeping) is consistent with the Act's purpose and does not require

health center to expend their grant funds and resources. Such decisions are

susceptible to policy considerations protected by the discretionary function

exception.

## IV.    Nicole Moretti Failed to Exhaust Her Administrative Remedies

Nicole Moretti did not present her claim in writing to HHS during the period

prescribed by law before bringing this lawsuit against the United States. This Court

Page  30  – UNITED STATES' REPLY IN SUPPORT OF MOTION TO DISMISS

therefore lacks subject matter jurisdiction over her claims. Before a plaintiff may bring a claim against the United States, they must first present the claim in writing to the appropriate agency and that claim must be finally denied by the agency. 28 U.S.C. § 2675(a). These requirements are jurisdictional, strictly adhered to, cannot be waived, and are construed in the United States' favor by courts. *See Cadwalder v. United States*, 45 F.3d 297, 300–01 (9th Cir. 1995); *McNeil v. United States*, 508 U.S. 106, 112–13 (1993). Additionally, the FTCA provides that claims not presented to the appropriate agency within two years of when the claim originally accrues will be "forever barred." 28 U.S.C. § 2401(b). "[T]he Supreme Court has described the FTCA's exhaustion requirement as a 'clear statutory command.'" *Valadez-Lopez v. Chertoff*, 656 F.3d 851, 855 (9th Cir. 2011) (quoting *McNeal*, 508 U.S. at 113).

Wendy Novins, acting as the personal estate representative of Saylor Moretti, filed an SF-95 Form solely on behalf of the estate. Am. Compl. ¶ 9, *see also* Mot. to Dismiss. Attach. 1, ECF No. 26-1. Nicole Moretti was not listed as a claimant on this form. *Id.* Any and all reference to Nicole Moretti is limited to box 8 of the SF-95 Form which describes the basis of Wendy Novins' claim on behalf of the estate. *See* Flaim Decl. Ex. E. Specifically, this paragraph describes Nicole Moretti's relationship to Saylor Moretti and her role in the underlying circumstances which gave rise to the wrongful death claim brought by Saylor Moretti's estate. *Id.*

Plaintiff's argument that the Court should recognize Nicole Moretti as a claimant based on the FTCA's "minimal" notice requirement confuses the issues. Liberally construing the estate representative's claim does not cure the fatal defect

that Nicole Moretti failed to exhaust (or raise) her own claim. The Supreme Court

has stated that the procedural requirements stated by Congress in 28 U.S.C.

§ 2675(a) require "strict adherence." *McNeil*, 508 U.S. at 113; *see also Cadwalder*, 45

F.3d at 300 ("[W]e interpret the FTCA's administrative claim provisions strictly.").

While the FTCA's procedural requirements must be strictly adhered to, the Ninth

Circuit has determined that the notice requirement under § 2675(a) is "minimal."

*Shipek v. United States*, 752 F.2d 1352, 1354 (9th Cir. 1985); *see also Avery v.*

*United States*, 680 F.2d 608, 610 (9th Cir. 1982). The word "minimal" in this context

means that a claimant's written claim must "sufficiently inform the relevant agency

of the existence of a claim." *Shipek* 752 F.2d at 1354. This notice requirement

applies to the substance of a claimant's claim, and it does not supplant the

procedural requirement that each claimant file a claim with the relevant agency.

*See Cadwalder*, 45 F.3d at 300.

Here, Nicole Moretti has not met the FTCA's exhaustion requirements

because she failed to file a SF-95 form with HHS. "Section 2675(a) requires *the*

*claimant or his legal representative* to file (1) a written statement sufficiently

describing the injury to enable the agency to begin its own investigation, and (2) a

sum certain damages claim." *Cadwalder* 45 F.3d at 301 (quoting *Warren v. United*

*States Dept. of Interior Bureau of Land Mgmt.*, 724 F.2d 776, 780 (9th Cir. 1984)).

Had Nicole Moretti or her legal representative filed an SF-95 form which properly

listed her as a claimant, HHS could have investigated that claim, and then the

Court could evaluate whether her claim met the notice requirements. Her failure to

do so means she has not met the clear statutory command of § 2675(a). *See McNeal*, 508 U.S. at 113; *Cadwalder* 45 F.3d at 301.

The cases Plaintiff cites are inapposite and involved plaintiffs who filed their claims in writing. None support the proposition that Nicole Moretti met the FTCA's exhaustion requirements by relying on another party's SF-95 form. In Plaintiff's strongest case, *Goodman v. United States*, the plaintiff (who filed a SF-95 form in his individual capacity) mistakenly brought a wrongful death claim as the estate's representative. 298 F.3d 1048, 1052 (9th Cir. 2002). There, Maryland law required that he bring the wrongful claim in his individual capacity (the opposite of Oregon law). *Id.* at 1054. The Ninth Circuit affirmed the trial court's decision to allow the plaintiff to amend his complaint to allege the wrongful death claim in his individual capacity. *Id.* Moreover, *Estate of Burkhart v. United States*, involved two *pro se* plaintiff parents of the decedent and turned-on confusion created by errors on the SF-95 form and the fact that the decedent shared a name with one of the claimants. No. C 07-5467 PJH, 2008 WL 4067429, at *4–5 (N.D. Cal. Aug. 26, 2008). That ruling was narrowed by circumstances not presented here.

Because Nicole Moretti did not properly exhaust her administrative remedies by filing her own SF-95 form before invoking the judicial process, this Court lacks subject-matter jurisdiction over any purported claim she might have. Additionally, because it has been more than two years since the underlying incident, her claims against the United States are "forever barred." 28 U.S.C. § 2401(b).

## V. Nicole Moretti Lacks Capacity Under Oregon Law to Bring a Wrongful Death Claim Because She is Not the Representative of Saylor's Moretti's Estate

As raised in the United States' Motion, Oregon law does not permit Nicole Moretti to bring a wrongful death claim because she is not the personal representative of Saylor Moretti's estate. *See* Mot. to Dismiss. Part III. Even if Nicole Moretti sufficiently exhausted her administrative remedies to meet the FTCA's jurisdictional requirements, only Wendy Novins as the estate representative may bring the wrongful death claim. When Nicole Moretti petitioned Multnomah County Circuit Court to appoint Wendy Novins as the estate representative, she wrote: "The sole purpose of opening this probate is to allow the personal representative to pursue wrongful death litigation." *See* Pet. for Probate Appointment of Personal Representative, *In Re Saylor Moretti*, No. 20BP03388 (Or. Cir. Ct. May 8, 2020), Dkt. No. 1.

Nicole Moretti has no claim independent from the estate's wrongful death claim—which is the *only* claim alleged in the Amended Complaint. *See* Am. Compl. ¶ 14. Under Oregon law, only the personal representative of the decedent's estate— Wendy Novins in this case—has the capacity to bring a claim for wrongful death. *See* Or. Rev. Stat. ("O.R.S.") § 30.020(1). The Oregon Supreme Court recently considered the question of whether a statutory beneficiary under O.R.S. § 30.020(1) who was not the estate representative could bring a wrongful death claim. The Oregon Supreme Court held that, "[t]he personal representative is the only person authorized to 'maintain' the lawsuit." *Dahlton v. Kyser*, 370 Or. 34, 49 (2022).

The wrongful death statute provides that only the personal representative has the authority to maintain the wrongful death action. *See* ORS 30.020(1). The personal representative is the person who brings the action, makes litigation decisions during the proceedings, and has the authority to settle the case. The statutory scheme does not allow statutory beneficiaries "to enforce the right sued on," or to "control the action brought to enforce [the right]," as would be true of a real party in interest.

*Id.* at 50–51.

Parents and other family members are beneficiaries under this statutory scheme, but the personal estate representative is the only individual who can bring a wrongful death claim and sole decisionmaker regarding "whether to settle, what claims to bring, and how to proceed with litigation." *Id.* at 49. Beneficiaries, like Nicole Moretti, have "no role in the litigation process." *Id*. Beneficiaries have no legal authority to bring a wrongful death claim and are entirely "subject to the decisions made by the personal representative." *Id.* at 51. In short, "statutory beneficiaries are not 'parties' to a wrongful death action." *Id.* at 43. In the present case, Nicole Moretti, as a statutory beneficiary, is not a party to the wrongful death action before the Court, and only Wendy Novins may represent Saylor Moretti's estate under O.R.S. § 30.020(1). Nicole Moretti has no role in the actual litigation process of that claim and no ability to file such a claim or join the claim filed by Wendy Novins. *Id.* at 51 ("The personal representative is the person who brings the action, makes litigation decisions during the proceedings, and has the authority to

settle the case.").[5]

Because Nicole Moretti is only a beneficiary of Saylor Moretti's estate and not its representative, she lacks capacity to bring a wrongful death claim under Oregon law. Accordingly, Nicole Moretti is not a proper party in this lawsuit and her wrongful death claim should be dismissed with prejudice.

## CONCLUSION

The United States respectfully requests that the Court grant its Motion and dismiss Plaintiffs' claims against the United States with prejudice.

Dated: September 9, 2022.

NATALIE K. WIGHT
United States Attorney
District of Oregon

*/s/ Michael J. Jeter*
MICHAEL J. JETER
Assistant United States Attorney
Attorneys for Defendant

### CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), because it contains 9,912 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

---

[5] The Oregon Supreme Court in *Dahlton* also rejected the argument that Plaintiff raises here that a beneficiary is a "real party in interest" and therefore could bring a wrongful death claim. 370 Or. at 50–51. The Court held that beneficiaries do not meet the definition of "real parties in interest" and "have no authority to make decisions about how the litigation proceeds, when it is filed, or when it is settled. Rather, they are subject to the decisions made by the personal representative." *Id.* at 51.